# Exhibit "1"

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI COUNTY, FLORIDA

CASE NO.:

ORBSAT CORP, a Nevada corporation,

      Plaintiff,

v.

THOMAS SEIFERT, an individual,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff, ORBSAT CORP ("Orbsat" or the "Company"), by and through its undersigned counsel, hereby sues Defendant, THOMAS SEIFERT ("Seifert"), and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages in excess of $30,000.00 and equitable relief, exclusive of interest, attorneys' fees, and costs.

2.      Defendant, THOMAS SEIFERT, is an individual residing in Douglas County, Colorado and is otherwise *sui juris*.

3.      Plaintiff, ORBSAT CORP, is a Nevada corporation with its headquarters in Miami-Dade County, Florida and otherwise doing business in Miami-Dade County, Florida.

4.      Venue in Miami-Dade County, Florida is appropriate, as the breaches of fiduciary duty, fraudulent inducement, and unjust enrichment all occurred in Miami-Dade County, Florida.

5.      All conditions precedent have been performed, have occurred, or have been waived.

6.      Plaintiff has retained the law firm of Phillips, Cantor & Shalek, P.A., and have agreed to pay them a reasonable fee.

1

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

## **GENERAL ALLEGATIONS**

7.      In October of 2020, Seifert began employment with Orbsat, and on March 11, 2021, Orbsat and Seifert entered into an Employment Agreement with Seifert serving as the Chief Financial Officer of Orbsat (the "Employment Agreement"). A copy of the Employment Agreement is attached hereto as **Exhibit "A"**.

8.      As an officer of Orbsat, Seifert owed fiduciary duties to Orbsat, including the duty of care, the avoidance of corporate waste, and the duty of loyalty.

9.      On May 27, 2021, at 5:36 AM, Seifert received a patently fraudulent and phony email requesting a wire transfer of $45,000.00 from Orbsat (the "Phony Request") to NASDAQ, a copy of which is attached hereto as **Exhibit "B"**.

10.      The Phony Request was riddled with grammatical errors and contained red flags as to its false and fraudulent nature and origin. The sender had a false ".net" address, instead of ".com". The Cc'd individuals had misspelled addresses with the name "advisoiry". The first sentence of the email is a run on sentence with mis-capitalized words and lacking periods: ", Am sending the bank details again to Mr Thomas Seifert". The second sentence also has mis-capitalized words and missing periods, and the nature of the request is suspicious: "Mr Tom, The Wells Fargo Bank account # wasn't input correctly." The email lacks any logo of NASDAQ or any other authorized company. Phishing emails often refer to the recipient as Mr. Tom (using the first name) rather than the American title of Mr. Siefert (using the last name).

11.      The Phony Request lists a cell phone number (not a business line), and Seifert failed to call or confirm this cell phone number. Seifert failed to inquire why there was a wire transfer request from NASDAQ at 5:00 AM outside of business hours.

12.      On May 27, 2021, Seifert initiated the wire of $45,000.00 from the account of

Phillips, Cantor & Shalek, P.A.; Tel: (954) 966-1820 Fax: (954) 414-9309
Presidential Circle, 4000 Hollywood Boulevard, Suite 500-North, Hollywood, Florida 33021

Orbsat to the unauthorized recipient. Seifert failed to confirm the wire instructions through not calling NASDAQ to confirm the new wire information, failed to verbally confirm the identity of the recipient of the wire, and failed to timely confirm the wire was received by the proper recipient. Seifert failed to gather information regarding this patently phony wire request, which had numerous suspicious circumstances. Seifert did not timely notify Orbsat of the Phony Request.

13.     More importantly, Orbsat's policy required two approvals for all new wiring instructions before the wire could be executed.  This policy was known to PNC where the Company held its checking and money market accounts.

14.     At some point after becoming CFO, Seifert opened a new bank account at Bank of America and transferred Company funds into that account. Despite the Company policy, Seifert set up the wire transfer procedures at Bank of America to only need one authorization, unbeknownst to the to the Board of Directors of Orbsat (the "Board of Directors" or "Board").

15.     Seifert ignored the Company policy when he sent the wire.

16.     Had Seifert timely learned that NASDAQ did not receive the wire, he could have called the recipient bank to place a hold on the account and investigate the fraudulent account.

17.     On May 28, 2021, the Company disclosed by way of a Current Report on Form 8-K that contemporaneous with the effectiveness of the registration statement relating to the Company's recent underwritten public offering, certain individuals joined the Company as members of the Board of Directors.

18.     Seifert took advantage of the change in the Board of Directors.

19.     During the same time period, May-June 2021, as Orbsat was preparing for a new board of directors, Seifert insisted that Orbsat enter into a new contract with Seifert. Since Orbsat has a pending registration statement relating to the Company's recent underwritten public offering,

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

Seifert knew that his contract would need to go through an audit review, underwriting review, and a review by counsel for Orbsat.

20.     Seifert had possession of his own unapproved and unreviewed draft executive employment agreement, to which he requested several of his own edits ("Unapproved Employment Agreement"), a copy of which is attached hereto as **Exhibit "C"**.

21.     On June 1, 2021, at 5:01 PM, Seifert emailed a draft executive employment agreement to counsel for Orbsat for review and approval for another officer of Orbsat. Seifert did not send his own Unapproved Employment Agreement, despite having possession of it. Counsel for Orbsat did not review and approve the draft employment agreement of the other officer before the Meeting of the Board of Directors scheduled for the following day.

22.     Prior to the Meeting of the Board of Directors, <u>Seifert failed to send his</u> Unapproved Employment Agreement to counsel for Orbsat, nor did the Unapproved Employment Agreement go through the audit review and underwriting review.

23.     On June 1, 2021, at 6:58 PM, Seifert emailed several draft employment agreements—including his own Unapproved Employment Agreement—to the Board.

24.     On June 2, 2021, Orbsat conducted a telephonic Meeting of the Board of Directors.

25.     During the meeting, Seifert presented several executive employment agreements for Board approval, including his own Unapproved Employment Agreement.

26.     Seifert falsely misrepresented to the entire Board that his Unapproved Employment Agreement was reviewed and approved by counsel for Orbsat.

27.     Seifert knew or should have known that his Unapproved Employment Agreement required underwriter review, audit review, and corporate counsel review. Seifert's responsibility included putting the agreements through the review process. For example, before Orbsat voted on

Phillips, Cantor & Shalek, P.A.; Tel: (954) 966-1820 Fax: (954) 414-9309
Presidential Circle, 4000 Hollywood Boulevard, Suite 500-North, Hollywood, Florida 33021

employing a new Executive Chairman of the Board, Seifert had the contract reviewed by the underwriters, auditors, and corporate counsel.

28.     Seifert's also advised the Board that outside counsel approved the issuance of stock to Seifert. No such approval occurred. Nevertheless, without the approval but based on Seifert's representation that approval occurred, Seifert prepared a resolution for the Board which they approved issuing stock to him. But for the false representation, the Board would not have approved the stock issuance.

29.     Based on the false misrepresentations of Seifert, Orbsat approved Seifert's Unapproved Employment Agreement. A copy of the executed Unapproved Employment Agreement is attached hereto as **Exhibit "D"**.

30.     Upon learning of Seifert's grossly negligent and reckless actions in sending the wire transfer to an unauthorized recipient, Orbsat promptly began reviewing Seifert's work. Upon further review, Orbsat discovered Seifert's fraudulent misrepresentations and non-disclosures involved in his Unapproved Employment Agreement.

## <u>COUNT I – BREACH OF FIDUCIARY DUTY (DUTY OF CARE)</u>

31.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

32.     As officer of Orbsat, Seifert owed fiduciary duties in the conduct of Orbsat's activities and affairs.

33.     Seifert breached his fiduciary duties by failing to act with a duty of care toward Orbsat and failing to protect Orbsat's financial interest.

34.     On May 27, 2021, at 5:36 AM, Seifert received a patently fraudulent Phony Request for a wire transfer of $45,000.00 from Orbsat to NASDAQ.

35.     Seifert breached his duty of care in failing to identify the Phony Request's

5

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

grammatical errors and numerous red flags as to its false and fraudulent nature, failing to identify that the sender of the email had a false ".net" address, instead of ".com", failing to identify that the Cc'd individuals had misspelled addresses with the name "advisoiry", failing to identify the phony nature of the request with the run-on sentences and missing periods, failing to identify the suspicious timing of a business request for a wire at 5:00 AM, and failing to identify the suspicious nature of the email lacking any business logo or NASDAQ logo.

36.     Seifert breached his duty of care in failing to call or confirm the cell phone number (not a business line) listed in the email, failing to call or confirm the wire instructions through a business line, failing to confirm the wire instructions, failing to verbally confirm the identity of the recipient of the wire, and failing to timely confirm the wire was received by the proper recipient. Seifert further failed to inquiry why there was a wire transfer request from NASDAQ at 5:00 AM, outside of business hours.

37.     In the face of these suspicious circumstances, Seifert grossly mismanaged Orbsat's funds and breached his duty of care by initiating the wire of $45,000.00 from the account of Orbsat to the unauthorized recipient on May 27, 2021.

38.     Seifert's breaches of his fiduciary duties are the proximate and legal cause of substantial damages to Orbsat.

WHEREFORE, Plaintiff ORBSAT CORP, demands judgment against Defendant THOMAS SEIFERT, for monetary damages, all pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted under Florida law.

### COUNT II – BREACH OF FIDUCIARY DUTY (CORPORATE WASTE)

39.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

40.     As officer of Orbsat, Seifert owes fiduciary duties in exercising good faith and fair

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

dealing in the use and preservation of Orbsat's property and assets.

41.     Seifert recklessly breached his fiduciary duties by creating waste of corporate assets to the detriment of Orbsat.

42.     Seifert dissipated and wasted Orbsat's assets through the improper transfer of Orbsat's funds directly to an unauthorized recipient.

43.     On May 27, 2021, at 5:36 AM, Seifert received a patently fraudulent Phony Request for a wire transfer of $45,000.00 from Orbsat to NASDAQ, a copy of which is attached hereto as **Exhibit "B"**.

44.     Seifert wasted corporate assets in failing to identify the Phony Request's grammatical errors and numerous red flags as to its false and fraudulent nature, failing to identify that the sender of the email had a false ".net" address, instead of ".com", failing to identify that the Cc'd individuals had misspelled addresses with the name "advisoiry", failing to identify the phony nature of the request with the run-on sentences and missing periods, failing to identify the suspicious timing of a business request for a wire at 5:00 AM, and failing to identify the suspicious nature of the email lacking any business logo or NASDAQ logo.

45.     Seifert wasted corporate assets in failing to call or confirm the cell phone number (not a business line) listed in the email, failing to call or confirm the wire through a business line, failing to confirm the wire instructions, failing to verbally confirm the identity of the recipient of the wire, and failing to timely confirm the wire was received by the proper recipient. Seifert further failed to inquiry why there was a wire transfer request from NASDAQ at 5:00 AM, outside of business hours. Furthermore, Seifert released confidential information with the wire transfer to an unauthorized recipient.

46.     Furthermore, Seifert knowingly, intentionally, and recklessly violated his duties to

Phillips, Cantor & Shalek, P.A.; Tel: (954) 966-1820 Fax: (954) 414-9309
Presidential Circle, 4000 Hollywood Boulevard, Suite 500-North, Hollywood, Florida 33021

Orbsat by creating waste of corporate assets through fraudulently increasing the terms of his employment pursuant to the Unapproved Employment Agreement.

47.     Seifert's breaches of his fiduciary duties are the proximate and legal cause of substantial damages to Orbsat.

WHEREFORE, Plaintiff ORBSAT CORP, demands judgment against Defendant THOMAS SEIFERT, for monetary damages, all pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted under Florida law.

<u>**COUNT III – BREACH OF FIDUCIARY DUTIES (DUTY OF LOYALTY)**</u>

48.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

49.     As officer of Orbsat, Seifert owes a fiduciary duty of loyalty, including the obligation of putting the interests of Orbsat ahead of his own interests, and the obligation of not exploiting the relationship for Seifert's own personal benefit.

50.     Seifert recklessly breached his duty of loyalty by fraudulently misrepresenting the approval of his Unapproved Employment Agreement.

51.     As Orbsat was preparing for a new board of directors, Seifert insisted that Orbsat enter into a new contract with Seifert for his own self-interest. Seifert knew that the Unapproved Employment Agreement would need to go through an audit review, underwriting review, and a review by counsel for Orbsat; however, Seifert avoided these review steps to secure favorable employment terms for himself.

52.     On June 1, 2021, at 6:58 PM, Seifert emailed several draft employment agreements—including his own Unapproved Employment Agreement—to the Board.

53.     On June 2, 2021, Orbsat conducted a telephonic Meeting of the Board of Directors.

54.     During the meeting, Seifert presented several executive employment agreements

Phillips, Cantor & Shalek, P.A.; Tel: (954) 966-1820 Fax: (954) 414-9309
Presidential Circle, 4000 Hollywood Boulevard, Suite 500-North, Hollywood, Florida 33021

for Board approval.

55.     Seifert falsely misrepresented that his Unapproved Employment Agreement had been reviewed and approved.

56.     Seifert's also requested a Board resolution authorizing the issuance of stock to Seifert.

57.     Seifert represented to the Board that Orbsat's counsel authorized and approved the issuance of additional stock. Orbsat's counsel denies receiving any request and he never approved same. Moreover, Orbsat could not issue the additional stock.

58.     Based on the false misrepresentations of Seifert, Orbsat approved Seifert's Unapproved Employment Agreement.

59.     In securing the Unapproved Employment Agreement for his own benefit and advantage, Seifert breached the duty of loyalty he owed to Orbsat.

60.     Seifert's breaches of his fiduciary duties are the proximate and legal cause of substantial damages to Orbsat.

WHEREFORE, Plaintiff ORBSAT CORP, demands judgment against Defendant THOMAS SEIFERT, for monetary damages, all pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted under Florida law.

<u>COUNT IV (FRAUDULENT INDUCEMENT)</u>

61.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

62.     Plaintiff fraudulently induced Orbsat in the execution of Seifert's Unapproved Employment Agreement.

63.     On June 1, 2021, at 6:58 PM, Seifert emailed several draft employment agreements—including his own Unapproved Employment Agreement—to the Board.

9

64.     On June 2, 2021, Orbsat conducted a telephonic Meeting of the Board of Directors.

65.     During the meeting, Seifert presented several executive employment agreements for Board approval.

66.     On June 2, 2021, Seifert made a false statement of material fact that all of the agreements were reviewed and approved, including his own Unapproved Employment Agreement.

67.     Seifert's also requested a Board resolution authorizing the issuance of stock to Seifert.

68.     Seifert represented to the Board that Orbsat's counsel authorized and approved the issuance of additional stock. Orbsat's counsel denies receiving any request and he never approved same. Moreover, Orbsat could not issue the additional stock.

69.     Seifert knew that his false statement of material fact was indeed false, as he knew his own Unapproved Employment Agreement and request for additional stock was never approved by counsel for Orbsat and never underwent the required audit review and underwriting review.

70.     Seifert intended that the Board rely on his misrepresentations and false statements, to induce Orbsat to approve and execute his Unapproved Employment Agreement and to approve the stock issuance. The Board relied on Seifert's misrepresentations and false statements to its detriment.

71.     Seifert's fraudulent inducement has caused Orbsat injury through the increased and more favorable terms to Seifert under the Unapproved Employment Agreement and the request for additional stock.

WHEREFORE, Plaintiff ORBSAT CORP, demands judgment against Defendant THOMAS SEIFERT, for rescission of the Boards actions at the Board meeting including but not limited to rescission of the Unapproved Employment Agreement, monetary damages, all pre-

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

judgment and post-judgment interest, costs, attorneys' fees as permitted under Florida law.

## COUNT V – UNJUST ENRICHMENT

72.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

73.     Orbsat conferred a benefit on Seifert through the terms of Seifert's Unapproved Employment Agreement. Seifert voluntarily accepted and retained the conferred benefit.

74.     As a result of the additional compensation taken by Defendant Seifert, Seifert has been unjustly enriched. The circumstances of Seifert fraudulently inducing Orbsat to enter into Seifert's Unapproved Employment Agreement makes it inequitable for Seifert to retain the additional compensation under the Unapproved Employment Agreement without paying the value back to Seifert.

75.     Due to the unjust enrichment of Seifert, Orbsat has been damaged.

WHEREFORE, Plaintiff ORBSAT CORP, demands judgment against Defendant THOMAS SEIFERT, for monetary damages, all pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted under Florida law.

## COUNT VI – RESCISSION

73.     Plaintiff realleges Paragraph Nos. 1 through 30 *supra* as if fully set forth herein.

74.     The Unapproved Employment Agreement was obtained by fraud.

75.     Seifert, including his failure of full and fair disclosure and by his intentionally deceptive conduct, persuaded the Board to approve his contract and stock issuance based on information that was knowingly false.

76.     Orbsat relied upon the representations and omissions of Seifert.

77.     Upon investigation and discovery of the fraud, the Orbsat moved with all due speed and diligence to rescind the Unapproved Employment Agreement and file this action.

Phillips, Cantor & Shalek, P.A.; Tel: (954) 966-1820 Fax: (954) 414-9309
Presidential Circle, 4000 Hollywood Boulevard, Suite 500-North, Hollywood, Florida 33021

78.     Plaintiff has no adequate remedy at law and demands rescission of the Unapproved Employment Agreement and Board Resolution authorizing the issuance of additional stock, which was fraudulently and/or otherwise improperly obtained.

WHEREFORE, Plaintiff ORBSAT CORP, requests that this Court enter judgment against Defendant THOMAS SEIFERT for rescission of the Unapproved Employment Agreement and Board Resolution authorizing the issuance of additional stock, interest, costs, and such other and further relief as may be just, necessary, and appropriate.

## COUNT VII – DECLARATORY JUDGMENT

79.     Plaintiff realleges Paragraph Nos. 1 through 30 supra as if fully set forth herein.

80.     This is an action for Declaratory Judgment pursuant to Chapter 86, Florida Statutes over which this Court has jurisdiction.

81.     The Unapproved Employment Agreement was obtained by fraud.

82.     Plaintiff is in doubt as to their rights under the Unapproved Employment Agreement and more specifically its enforceability against it by Defendant.

87.     There is a bona fide, actual, present, and practical need for a declaration with respect to the enforceability the Unapproved Employment Agreement, as Plaintiff asserts that it is unenforceable and void, and Defendant contends that it remains valid.

88.     Plaintiff has no adequate remedy at law and demands that the Unapproved Employment Agreement, obtained by fraud, be declared void and unenforceable.

89.     Plaintiff will be irreparably harmed if this Court does not find the Unapproved Employment Agreement to be void and unenforceable.

WHEREFORE, ORBSAT CORP respectfully requests this Court enter a Judgment

PHILLIPS, CANTOR & SHALEK, P.A.; TEL: (954) 966-1820 FAX: (954) 414-9309
PRESIDENTIAL CIRCLE, 4000 HOLLYWOOD BOULEVARD, SUITE 500-NORTH, HOLLYWOOD, FLORIDA 33021

declaring that Defendant THOMAS SEIFERT obtained the Unapproved Employment Agreement by fraud, that the Unapproved Employment Agreement is void and unenforceable, and award Plaintiff its costs, and such other and further relief as may be just, necessary and appropriate.

Dated June 28, 2021.

> **PHILLIPS, CANTOR & SHALEK, P.A.**
> **Plaintiff ORBSAT CORP**
> Presidential Circle
> 4000 Hollywood Boulevard, Suite 500-N
> Hollywood, Florida 33021
> Telephone: (954) 966-1820 / Fax:  (954) 414-9309
>
> By:___/s/GARY S. PHILLIPS_____
>         GARY S. PHILLIPS
>         Florida Bar No.  339814
>         Primary: gphillips@phillipslawyers.com
>         Secondary: ttrippe@phillipslawyers.com
>         KEVIN D. KLAGGE
>         Florida Bar No.  99502
>         Primary: kklagge@phillipslawyers.com
>         Secondary: ttrippe@phillipslawyers.com

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of the 11th day of March, 2021  (the "Effective Date"), by and between Orbsat Corp.,  a  Nevada corporation (the "Company"), and Thomas Seifert (the "Executive"). The Company and the Executive are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### WITNESSTH:

**WHEREAS,** the Company desires to employ the Executive on the terms and conditions set forth herein; and

**WHEREAS,** the Executive desires to be employed by the Company on such terms and conditions.

### Agreement:

1.     **Term**: The term of this Agreement shall start on the Effective Date and end on the one (1) year anniversary of the Effective Date, which will be automatically extended for additional one (1) year terms thereafter unless terminated by the Company or the Executive by written notice to the other Party not later than ninety (90) days prior to the end of the initial term or any extension term, as applicable, subject in all events to early termination pursuant to Section 5 (as so extended or terminated, the "Term").  Notwithstanding any other provisions  this Agreement, the Company shall have an obligation to make any payments to Executive for Base Salary  and Bonuses, as defined below and as required by this Agreement.

2.     **Services and Exclusivity of Services**: So long as this Agreement shall continue in effect, Executive shall devote substantially all of his business time and attention to the performance of the Executive's duties hereunder as assigned by the CEO and the Board of Directors of the Company (the "Board"), to the extent consistent with Section 3, provided that the Company acknowledges that Executive maintains a consulting business which does not conflict or interfere with the services, duties and responsibilities of Executive hereunder, and, as such, the Company does not object to Executive's continued operation of his consulting business during the Term. Executive shall use Executive's commercially reasonable efforts and abilities to promote the Company's interests and shall perform the  services contemplated by this Agreement in accordance with the policies established by and under the  direction of the CEO and the Board, to the extent consistent with Section 3.  Executive  agrees  to  faithfully and diligently promote the business affairs and interests  of the Company and its subsidiaries.

3.     **Duties and Responsibilities**:  Executive shall serve as the Chief Financial Officer  of the Company, with such duties, responsibilities and authority commensurate and consistent with  such positions, as may be, from time to time, assigned to him by the CEO and the Board. The Executive shall report directly to the CEO. Executive shall  render his services from Parker, Colorado, and will not be required to relocate his residence from Parker, Colorado at any time during the Term hereof. Executive agrees to travel as and to the extent reasonably  requested by the  Board in connection with the  performance of his  services hereunder.

Notwithstanding the foregoing,  the  expenditure of reasonable amounts of time by the Executive for the making of passive personal  investments, the conduct of private business affairs (including other future directorships other than serving  on the Board of Directors of a competing business) and charitable and professional activities shall be  allowed, provided such activities do not materially interfere with the services required to be rendered by the Executive to the Company hereunder and do not violate the confidentiality provisions set forth in Section 7 or the non-competition and non-solicitation provisions set forth in Section 8 below. The Company understands and acknowledges, consistent with the foregoing, that Executive currently has other  personal passive

**EXHIBIT A**

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

investment interests in addition to his position hereunder as Chief Financial Officer of the Company.

4.    **Compensation**:

(a)    <u>Base Compensation</u>: The Executive's annual base salary shall be $150,000 per year, (the "Base Salary"), subject to (i) customary periodic review, modification and increase by the Board, (ii) periodic review, modification and increase by the Board in connection with material Company events, including, but not limited to, the Company's successful listing of the Company's capital stock on a national securities exchange such as the Nasdaq Capital Markets or the NYSE (the "listing"), as may be delegated by the Board to the Compensation Committee (as defined below) (references herein to the Compensation Committee shall include reference to the Board if no such Committee exists at any time), which such Base Salary shall be paid by the Company to the Executive in accordance with the Company's customary payroll practices, subject to customary withholding as required by applicable law.

(b)    <u>Bonuses</u>: Executive shall be entitled to (A) receive an annual cash bonus in an amount equal to up to 150% of the Base Salary if the Company meets or exceeds criteria adopted by the Compensation Committee of the Board (the "Compensation Committee"); (B) receive any additional bonuses as determined by the Board; and (C) participate in any other executive compensation plans adopted by the Board.

(c)    <u>Additional Benefits</u>: The Company agrees to provide the following "Additional Benefits" to Executive:

(i)    Medical plan coverage for Executive, his spouse and dependents during the Term, if any, at the expense of the Company, with such coverage or comparable coverage to continue following termination of employment hereunder, other than for Cause (as defined below) or without Good Reason (as defined below), as each term is defined in this Agreement in Section 5(d) for the remainder of the Term; provided that during the interim period prior to and until the Company's obtaining medical plan coverage for its employees, Executive shall receive $1,000 per month in lieu of medical plan coverage, which such monthly payment shall cease to be paid upon the Company obtaining a medical coverage plan for its employees;

(ii)    All rights and benefits for which Executive is otherwise eligible under any pension plan profit-sharing plan, dental, disability, or insurance plan or policy or other plan or benefit that the Company or its affiliates may provide (provided Executive is eligible under applicable law) for employees of the Company generally, as from time to time in effect, during the term of this Agreement;

(iii)    An automobile allowance for Executive in the amount of $750 per month; and

(iv)    Executive shall be eligible for four (4) weeks annual paid vacation during each year of the Term. Any vacation days not taken in a one (1) year period during the Term shall accrue and shall carry over to the subsequent year, provided that Executive may take up to a maximum of six (6) weeks' annual paid vacation in a one (1) year period during the Term.

(d)    <u>Equity Awards</u>.  During the Term, the Executive shall be entitled to receive, subject to approval by the Board, equity incentive grants, such as common stock or stock options of the Company: (i) commensurate with the Executive's position and performance, and (ii) reflective of the executive compensation plans that the Company has in place at such time.

5.    **Termination**:  This Agreement and all obligations hereunder except the obligations

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

contained in sections 4, 7, 8, and 9 (Additional Benefits, Confidential Information and Noncompetition and Non-Solicitation) which shall survive any termination hereunder shall terminate upon the earliest to occur of any of the following:

(a)     Expiration of Term: The expiration of the Term provided for in Section 1 herein.

(b)     Death or Disability of Executive: The "Total Disability" of Executive for the purposes of this Agreement shall be defined as, the Executive has failed to perform his regular and customary duties to the Company for a period of 180 days out of any 360-day period as determined by a medical expert appointed by the Company's disability insurance carrier, who will examine the Executive. The Executive hereby consents to such examination and consultation regarding his health and ability to perform as aforesaid. If Executive shall become subject to a Total Disability, Executive's employment may be terminated by written notice from the Company to Executive.

(c)     For Cause or Without Good Reason: The Company may terminate Executive's employment and all of Executive's rights to receive the Base Salary and Bonuses hereunder for Cause upon the resignation of Executive without Good Reason. For purposes of this Agreement, the term "Cause" shall be limited to the willful commission of a felony or other act of moral turpitude, which directly and demonstrably causes material, tangible harm to the Company. "Good Reason" shall be defined as the (i) demotion of Executive from the position of Chief Financial Officer; (ii) A material diminution by the Company in the Employee's authority, duties, or responsibilities from those specified in Section 3, (iii) the Executive ceasing to communicate or report to the Board, (iv) without the consent of Executive, any attempt to decrease Executive's Base Salary or Bonuses; (v) any breach of this Agreement by the Company; and (vi) a change by the Company of the principal location at which the Executive is required to perform his duties for Company to a new location that is outside of Parker, Colorado, without the Executive's consent

Notwithstanding the foregoing, Executive should not be terminated for Cause pursuant to this section 5(c) unless and until executive has received notice of a proposed termination for Cause an Executive has had an opportunity to be heard before at least the majority of the members of the Board. Executive shall be deemed to have had such opportunity is given written or telephonic notice at least 72 hours in advance of the meeting. The initial determination that Cause exists shall be made by the Board.

(d)     Without Cause or With Good Reason: Notwithstanding any other provision of this Section 5, the Board shall have the right to terminate Executive's appointment with the Company with or without Cause, and Executive shall have the right to resign with or without Good Reason, at any time. If the Company terminates Executive without Cause or Executive resigns for Good Reason then the Company shall: (A) within 10 days of such termination or resignation make an immediate lump sum payment to Executive in the amount of (i) two (2) times the then-applicable Base Salary, subject to withholding required by applicable law, and (ii) Base Salary and Bonuses for the remainder of the Term (based on the assumption that the Company would achieve all performance targets for all Bonuses), (B) provide the Additional Benefits provided for under Section 4 for the remainder of the Term, (C) full vesting of any stock options, restricted stock or other equity or equity-related incentives, e.g. SARs, then held by the Executive, and (D) a cash "gross up" payment equal to the aggregate amount of federal, state and local taxes resulting from the other payments made to Executive under this Section 9(d), assuming an aggregate incremental tax rate of 39%. The present value of the aggregate unpaid Base Salary and Bonuses shall be determined using the then applicable federal rate under the Internal Revenue Code.

(e)     Change in Control: Termination of the Executive's appointment with the Company as a result of, or in connection with, a Change in Control shall be treated as a termination without Cause, entitling the Executive to the compensation and other benefits provided for in Section 5(d), provided, however in no event shall such compensation as provided for in Section 5(d) be less

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

than Executive's total compensation during the year preceding the Change in Control. "Change in Control" shall mean the occurrence of any one or more of the following: (i) in any transaction or series of related transactions, the accumulation (if over time, in any consecutive twelve (12) month period), whether directly, indirectly, beneficially or of record, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended) of 50.1% or more of the shares of the outstanding common stock of the Company, whether by merger, consolidation, sale, issuance or other transfer of shares of common stock (other than a merger or consolidation where the stockholders of the Company prior to the merger or consolidation are the holders of a majority of the voting securities of the entity that survives such merger or consolidation), (ii) a sale of all or substantially all of the assets of the Company, or (iii) during any period of twelve (12) consecutive months, the individuals who, at the beginning of such period, constituted the members of the Board, no longer constitute the members of the Board at the end of such period.

6.     **Business Expenses**: The Executive shall be entitled to receive reimbursement for all reasonable business expenses incurred by him in connection with his duties under this Agreement. The Company understands that the Executive will maintain his primary residence elsewhere and any reasonable related travel fees incurred on behalf of Executive for business purposes, relating but not limited to corporate housing, business class hotel accommodations, business class airfare, and car rental will be reimbursed.

7.     **Confidential Information**:

(a)     The Executive recognizes, acknowledges and agrees that he has had and will continue to have access to secret and confidential information regarding the Company, its subsidiaries and their respective businesses ("Confidential Information"), including but not limited to, its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans, provided such information is not in or does not hereafter become part of the public domain, or become known to others through no fault of the Executive. The Executive acknowledges that such information is of great value to the Company, is the sole property of the Company, and has been and will be acquired by his in confidence. In consideration of the obligations undertaken by the Company herein, the Executive will not, at any time, during or after his employment hereunder, reveal, divulge or make known to any person, any information acquired by the Executive during the course of his/her employment, which is treated as confidential by the Company, and not otherwise in the public domain. The provisions of this Section 7 shall survive the termination of the Executive's employment hereunder for a period of one (1) year.

(b)     The Executive affirms that he does not possess and will not rely upon the protected trade secrets or confidential or proprietary information of any prior employer(s) in providing services to the Company or its subsidiaries.

(c)     In the event that the Executive's employment with the Company terminates for any reason, the Executive shall deliver forthwith to the Company any and all originals and copies, including those in electronic or digital formats, of Confidential Information; provided, however, Executive shall be entitled to retain (i) papers and other materials of a personal nature, including, but not limited to, photographs, correspondence, personal diaries, calendars and rolodexes, personal files and phone books, (ii) information showing his compensation or relating to reimbursement of expenses, (iii) information that he reasonably believes may be needed for tax purposes, and (iv) copies of plans, programs and. agreements relating to his employment, or termination thereof, with the Company.

8.     **Non-Competition and Non-Solicitation**:

(a)     The Executive agrees and acknowledges that the Confidential Information that the

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

Executive has already received and will receive is valuable to the Company and the Company and that its protection and maintenance constitutes a legitimate business interest of the Company and  the Company, to be protected by the non-competition restrictions set forth herein. The Executive  agrees and acknowledges that the non-competition restrictions set forth herein are reasonable and  necessary and do not impose undue hardship or burdens on the Executive. The Executive also  acknowledges that the Company's and its subsidiaries' businesses are conducted worldwide, and that the territory and scope of prohibited competition, and time duration set forth in the  non-competition restrictions set forth below are reasonable and  necessary to maintain the value of the  Confidential Information, and to protect the goodwill and other legitimate business interests of the   Company, its subsidiaries, affiliates and/or its clients or customers. The provisions  of  this  Section  8  shall  survive   the  termination  of  the  Executive's  employment hereunder for the time periods specified below.

(b)     The Executive hereby agrees and covenants that during the Term and the period thereafter provided below,  he  shall  not without  the  prior  written  consent  of  the  Company, directly or indirectly, in any capacity whatsoever, including, without  limitation, as an employee, employer,  consultant, principal, partner, shareholder, officer, director or any  other individual or representative capacity (other  than  (A)  as  a  holder  of  less  than  five  (5%)  percent  of  the outstanding securities of a company whose shares are traded on any national securities exchange or (B) as a limited partner or passive minority interest holder in a venture capital fund, private equity fund  or similar investment entity which holds or may hold an equity or debt position in portfolio companies that are competitive with the Company; provided, however, that the Executive shall be precluded from serving as an operating partner, general partner,  manager  or  governing  board designee with respect to  such portfolio companies):

(i)      engage,  own,  manage,  operate,  control,  be  employed  by,  consult  for, participate  in, or be connected in any manner with the ownership, management, operation or control of any business  in competition with the  Business of the Company, as defined in the next sentence. For purposes hereof,  the  term "Business" shall mean the sales and service of satellite voice and data equipment, and satellite-enabled voice, data, tracking and IoT connectivity services;

(ii) recruit, solicit or hire, or attempt to recruit, solicit or hire, any employee, or  independent contractor of the Company to leave the employment (or independent contractor relationship)  thereof,  whether  or not any such employee or independent contractor is party  to anemployment agreement, for the purpose of competing with the Business of the Company;

(iii) attempt  in  any  manner  to  solicit  or  accept  from  any  customer  of  the Company,  with  whom Executive had significant contact during Executive's employment by the Company (whether  under this Agreement or otherwise), business of the kind or competitive with the Business done by the  Company with such customer or to persuade  or  attempt to persuade any such customer to cease to do  business or to reduce the amount of business which such customer has customarily done or might do  with the Company, or if any such customer elects to move its business to a person other than the  Company, provide any services of the kind or competitive with the Business of the Company for such  customer, or have any ·discussions regarding any such service with such customer, on behalf of such  other person for the  purpose of  competing with the Business of the Company; or

(iv)     interfere  with  any  relationship,  contractual  or  otherwise,  between  the Company  and any other party, including, without limitation, any supplier, distributor, co-venturer or  joint  venturer of the Company, for the purpose of soliciting such other party to discontinue or reduce its  business with the Company for the purpose of competing  with the Business of the Company.

With respect to the activities described in subparagraphs (i), (ii), (iii) and (iv) above, the restrictions of  this Section 8 shall continue during the Term hereof and, upon termination of the

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

Executive's employment pursuant to Section 5 for a period of one (1) year thereafter.

9.      **Indemnification**:

(a)      <u>Indemnification of Executive</u>. To the fullest extent permitted by the Nevada Revised Statutes, the Company shall indemnify, hold harmless and advance expenses to the Executive, and shall reimburse the Executive for, any loss, liability, claim, damage, expense (including, but not limited to, costs of investigation and defense and reasonable attorneys' fees) arising from or in connection with the Executive's performance of his duties of employment under this Agreement. Such indemnification shall exclude, however, those claims for which it is proven that: (i) the Executive's actions or failure to act constituted a breach of his or his fiduciary duties as a director or officer, and (ii) the breach of those duties involved intentional misconduct, fraud or a knowing violation of law (each such claim an "Excluded Claim").

(b)      <u>Defense of Claims</u>. In the event that any action, suit or proceeding is brought against the Executive with respect to which the Company may have liability under this Section 9, the Company shall have the right, at its cost and expense, to defend such action, suit or proceeding in the name and on behalf of the Executive; provided, however, that the Executive shall have the right to retain his or his own counsel, with fees and expenses paid by the Company, if representation of the Executive by counsel retained by the Company would be inappropriate because of actual or potential differing interests between the Company and the Executive. In connection with any action, suit or proceeding subject to this Section 9, the Company and the Executive agree to render to each other such assistance as may reasonably be required in order to ensure proper and adequate defense of such action, suit or proceeding. The Company shall not, without the prior written consent of the Executive, settle or compromise any action, suit or proceeding if such settlement or compromise does not include an irrevocable and unconditional release of the Executive for any liability arising out of such action, suit or proceeding.

10.     **Miscellaneous**.

(a)      The Executive acknowledges that the services to be rendered by his under the provisions of this Agreement are of a special, unique and extraordinary character and that it would be difficult or impossible to replace such services. Accordingly, the Executive agrees that any breach or threatened breach by him of Sections 7 or 8 of this Agreement shall entitle the Company, in addition to all other legal remedies available to it, to apply to any court of competent jurisdiction to seek to enjoin such breach or threatened breach. The parties understand and intend that each restriction agreed to by the Executive hereinabove shall be construed as separable and divisible from every other restriction, that the unenforceability of any restriction shall not limit the enforceability, in whole or in part, of any other restriction, and that one or more or all of such restrictions may be enforced in whole or in part as the circumstances warrant. In the event that any restriction in this Agreement is more restrictive than permitted by law in the jurisdiction in which the Company seeks enforcement thereof, such restriction shall be limited to the extent permitted by law. The remedy of injunctive relief herein set forth shall be in addition to, and not in lieu of, any other rights or remedies that the Company may have at law or in equity.

(b)      Neither the Executive nor the Company may assign or delegate any of their rights or duties under this Agreement without the express written consent of the other; provided, however that the Company shall have the right to delegate its obligation of payment of all sums due to the Executive hereunder, provided that such delegation shall not relieve the Company of any of its obligations hereunder and the Company shall have the right to assign this Agreement in the event of the consummation of a Change in Control transaction (provided that Executive does not exercise his termination rights with respect thereto), provided that the Company requires any successor entity or person to expressly assume, be bound by, and agree to perform the Company's obligations under this Agreement and provides Executive with an instrument executed by any

such successor entity or person confirming the foregoing.

(c)      This Agreement constitutes and embodies the full and complete understanding and agreement of the parties with respect to the Executive's employment by the Company (it being understood that any equity incentive arrangements shall be governed by the terms of the documents for such equity incentive arrangements, provided that in the event of a conflict between this Agreement and the terms of the documents for such equity incentive arrangements, this Agreement will control and govern)supersedes all prior understandings and agreements, whether oral or written, between the Executive and the Company with respect thereto, and shall not be amended, modified or changed except by an instrument in writing executed by the Party to be charged. The invalidity or partial invalidity of one or more provisions of this Agreement shall not invalidate any other provision of this Agreement. No waiver by any Party of any provision or condition to be performed hereunder shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time, unless the instrument of waiver expressly provides otherwise.

(d)      This Agreement shall inure to the benefit of, be binding upon and enforceable against, the Parties hereto and their respective successors, heirs, beneficiaries, personal representatives, and permitted assigns.

(e)      The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

(f)      All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, receipt acknowledged, sent by registered or certified mail, return receipt requested, postage prepaid, or by private overnight mail service (e.g., Federal Express), receipt acknowledged, to the Party at the addresses set forth below or to such other address as any Party may hereafter give notice of in accordance with the provisions hereof. Notices shall be deemed given on the sooner of the date actually received or the third business day after sending.

(g)      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without reference to principles of conflicts of laws and each of the parties hereto irrevocably consents to the jurisdiction and venue of the federal and state courts located in the State of Nevada. The parties hereto shall initially attempt to resolve all claims, disputes or controversies arising under, out of or in connection with this Agreement by conducting good faith negotiations amongst themselves. If the parties hereto are unable to resolve the matter following good faith negotiations, the matter shall thereafter be resolved by binding arbitration and each Party hereto hereby waives any right it may otherwise have to the resolution of such matter by any means other than binding arbitration pursuant to this Agreement. Whenever a Party shall decide to institute arbitration proceedings, it shall provide written notice to that effect to the other parties hereto. The Party giving such notice shall, however, refrain from instituting the arbitration proceedings for a period of sixty (60) days following such notice. During this period, the parties shall make good faith efforts to amicably resolve the claim, dispute or controversy without arbitration. Any arbitration hereunder shall be conducted in the English language under the commercial arbitration rules of the American Arbitration Association. Any such arbitration shall be conducted in Miami, Florida by a panel of three arbitrators: one arbitrator shall be appointed by each of the Executive and the Company; and the third shall be appointed by the American Arbitration Association. The panel of arbitrators shall have the authority to grant specific performance. Judgment upon the award so rendered may be entered in any court having jurisdiction in the State of Nevada or application may be made to such court for judicial acceptance of any award and an order of enforcement, as the case may be. In no event shall a demand for arbitration be made after the date when institution of a legal or equitable proceeding based on the claim, dispute or controversy in question would be barred under this Agreement or by the applicable statute of limitations. The prevailing Party in any arbitration in accordance with this Agreement

DocuSign Envelope ID: 23476D08-BAAD-43D5-8679-DD9016D5A3D9

shall be entitled to recover from the other Party, in addition to any other remedies specified in the award, all reasonable costs, attorneys' fees and other expenses incurred by such prevailing Party to arbitrate the claim, dispute or controversy.

(h)     This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one of the same instrument. The parties hereto have executed this Agreement as of the date set forth above.

(i)     The Company shall maintain during the Term, Directors' and Officers' Professional Liability Insurance providing coverage to the Executive in amounts customary for public companies of the same size and scope of operations as the Company.

(j)     The Executive and the Company acknowledge that each of the payments and benefits promised to Executive under this Agreement must either comply with the requirements of Section 409A of the Code ("Section 409A"), and the regulations thereunder or qualify for an exception from compliance.  To that end, the Executive and the Company agree that the severance payments described herein are intended to be excepted from compliance with Section 409A as a short-term deferral pursuant to Treasury Regulation Section 1.409A-1(b)(4).  In the case of a payment that is not excepted from compliance with Section 409A, and that is not otherwise designated to be paid immediately upon a permissible payment event within the meaning of Treasury Regulation Section 1.409A-3(a), the payment shall not be made prior to, and shall, if necessary, be deferred to and paid on the later of the date sixty (60) days after the Executive's earliest separation from service (within the meaning of Treasury Regulation Section 1.409A-1(h)) and, if the Executive is a specified employee (within the meaning of Treasury Regulation Section 1.409A-1(i)) of the Company on the date of his separation from service, the first day of the seventh month following the Executive's separation from service. Furthermore, this Agreement shall be construed and administered in such manner as shall be necessary to effect compliance with Section 409A.

**Notices:**

**If to the Company:**

Orbsat Corp.
18851 NE 29th Avenue, Suite 700
Aventura, FL  33180
Attention: Board of Directors

**If to the Executive:**

Thomas Seifert
22384 Quail Run Drive ORU
Parker, Colorado 80138

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

Acknowledged and accepted:

COMPANY:

**ORBSAT CORP.**

Date: March 11, 2021

By: _David Phipps_

Name:   David Phipps
Title:   Chief Executive Officer

EXECUTIVE:

**THOMAS SEIFERT**

_Thomas Seifert_
5489CC7B5AF94A3...

Thomas Seifert

Date: March 11, 2021

**From:** Michael Wolf <michael.wolf@nasdsaq.net>
**Sent:** Thursday, May 27, 2021 5:36 AM
**To:** Thomas Seifert <tseifert@orbsat.com>
**Cc:** Tamara Kondic <tkondic@donohoeadvisoiry.com>; Katherine Petty <kpetty@donohoeadvisoiry.com>
**Subject:** Orbsat Corp (OSAT) Approval Letter & Wiring Instruction

Hi Tamara,

As I said on our telephone conversation yesterday, Am sending the bank details again to Mr Thomas Seifert

Mr Tom, The Wells Fargo Bank account# wasn't input correctly.
Please see attached the correct wiring instruction for the $45,000 Payment today.
If you have any questions here my Cell# 716 219 0757
please confirm you have received these and circulate the transfer POP (Proof of Payment).
Best,
Michael

EXHIBIT  B

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is made and entered into as of this ___ day of May 2021 (the "Effective Date"), by and between **ORBSAT CORP**, a Nevada corporation with offices at 18851 N.E. 29th Ave, Suite 700, Aventura, FL 33180 (the "Corporation"), and **THOMAS SEIFERT** (the "Employee"), under the following circumstances:

RECITALS:

A.    The Corporation desires to secure the services of the Employee upon the terms and conditions hereinafter set forth; and

B.    The Employee desires to render services to the Corporation upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, the parties mutually agree as follows:

1.    Employment. The Corporation hereby employs the Employee and the Employee hereby accepts employment as an Employee of the Corporation, subject to the terms and conditions set forth in this Agreement.

2.    Duties. The Employee shall serve as **Chief Financial Officer, Secretary and Treasurer** of the Corporation, with such duties, responsibilities, and authority as are commensurate and consistent with his position, as may be, from time to time, assigned to him by the Board of Directors (the "Board") of the Corporation. During the Term (as defined in Section 3), the Employee shall devote all of his full business time and efforts to the performance of his duties hereunder unless otherwise authorized by the Board.  Notwithstanding the foregoing, the expenditure of reasonable amounts of time by the Employee for the making of passive personal investments, the conduct of business affairs and charitable and professional activities shall be allowed, provided such activities do not materially interfere with the services required to be rendered to the Corporation hereunder and do not violate the restrictive covenants set forth in Section 9 below.  Employee shall notify Corporation of any physical, mental or emotional incapacity resulting from injury, sickness or disease that affects Employee's ability to carry out the duties and responsibilities of Employee's position.

3.    Term of Employment. The term of the Employee's employment hereunder, unless sooner terminated as provided herein (the "Initial Term"), shall be for a period of three (3) years commencing on the effective date of the Corporation's uplisting to a national stock exchange. The term of this Agreement shall automatically be extended for additional terms of one (1) year each (each a "Renewal Term") unless either party gives prior written notice of non-renewal to the other party no later than thirty (30) days prior to the expiration of the Initial Term ("Non-Renewal Notice"), or the then current Renewal Term, as the case may be. For purposes of this Agreement, the Initial Term and any Renewal Term are hereinafter collectively referred to as the "Term."

**EXHIBIT  C**

4.     Compensation of Employee.

(a)     The Corporation shall pay the Employee as compensation for his services hereunder, in monthly installments during the Term, the sum of $240,000 (the "Annual Base Salary"), less such deductions as shall be required to be withheld by applicable law and regulations and monthly advances against the salary. The Corporation shall review the Base Salary on an annual basis and has the right, but not the obligation, to increase it, but such salary shall not be decreased during the Term.

(b)     In addition to the Base Salary set forth in Section 4(a), the Employee shall be entitled to receive an annual cash bonus if the Corporation meets or exceeds criteria adopted by the Compensation Committee of the Board of Directors (the "Compensation Committee") for earning bonuses which criteria shall be adopted by the Compensation Committee annually. Bonuses shall be paid by the Corporation to the Employee promptly after determination that the relevant targets have been met, it being understood that the attainment of any financial targets associated with any bonus shall not be determined until following the completion of the Corporation's annual audit and public announcement of such results and bonuses shall be paid promptly following the Corporation's announcement of earnings. Employee is entitled to receive any additional bonuses as determined by the Board and its Compensation Committee and to participate in any other executive compensation plans adopted by the Board.

(c)     Equity Awards. Employee shall be eligible for such grants of awards under stock option or other equity incentive plans of the Corporation adopted by the Board and approved by the Corporation's stockholders (or any successor or replacement plan adopted by the Board and approved by the Corporation's stockholders) (the "Plan") as the Compensation Committee of the Corporation may from time to time determine (the "Share Awards"). Share Awards shall be subject to the applicable Plan terms and conditions, provided, however, that Share Awards shall be subject to any additional terms and conditions as are provided herein or in any award certificate(s), which shall supersede any conflicting provisions governing Share Awards provided under the Plan.

(d)     The Corporation shall pay or reimburse the Employee for all reasonable out-of-pocket expenses actually incurred or paid by the Employee in the course of his employment, consistent with the Corporation's policy for reimbursement of expenses which may be modified from time to time without notice.

(e)     The Employee shall be entitled to participate in such pension, profit sharing, group insurance, hospitalization, and group health and benefit plans and all other benefits and plans, including perquisites, if any, as the Corporation provides to its senior Employees (the "Benefit Plans").

5.     Termination.

(a)     This Agreement and the Employee's employment hereunder shall terminate upon the happening of any of the following events:

(i)     upon the Employee's death;

(ii)     upon the Employee's "Total Disability" (as defined in Section 22€(3) of the Internal Revenue Code of 1986, as amended);

(iii)    upon the expiration of the Initial Term of this Agreement or any Renewal Term thereof, if either party has provided a timely notice of non-renewal in accordance with Section 3, above;

(iv)     at the Employee's option, upon thirty (30) days prior written notice to the Corporation;

(v)     at the Employee's option, in the event of an act by the Corporation, defined in Section 5(c), below, as constituting "Good Reason" for termination by the Employee; and

(vi)     at the Corporation's option, in the event of an act by the Employee, defined in Section 5(d), below, as constituting "Cause" for termination by the Corporation.

(vii)    Nothing in this Section 5(b) shall be construed to waive the Employee's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. s.2601 *et seq*. and the Americans with Disabilities Act, 42 U.S.C. s12101 *et seq*.

(b)     For purposes of this Agreement, the term "<u>Good Reason</u>" shall mean that the Employee has resigned due to (i) a significant diminution of duties inconsistent with Employee's title, authority, duties and responsibilities, provided that Employee provides written notice of such resignation within five (5) business days of notification of such significant diminution of duties. Employee acknowledges that reassignment to an executive position in the Corporation or one of its subsidiaries does not meet the definition of a significant diminution of duties; (ii) any reduction of or failure to pay Employee compensation provided for herein, except to the extent Employee consents in writing prior to any reduction, deferral or waiver of compensation, which non-payment continues for a period of ten (10) days following written notice to the Corporation by Employee of such non-payment; (iii) any relocation of the principal location of Employee's employment outside of the State of Colorado or in a manner which makes remote work environment unfeasible without the Employee's prior written consent; (iv) at any time following the consummation of any Change in Control Transaction (as defined below); (vi) any material violation by the Corporation of its obligations under this Agreement that is not cured within thirty (30) days after receipt of written notice thereof from the Employee.  For purposes of this Agreement, the term "<u>Change in Control Transaction</u>" means the sale of the Corporation or its predecessor to an un-affiliated person or entity or group of un-affiliated persons or entities pursuant to which such party or parties acquire (i) shares of capital stock of the Corporation representing at least fifty percent (50%) of outstanding capital stock or sufficient to elect a majority of the Board of the Corporation (whether by merger, consolidation, sale or transfer of shares (other than a merger where the Corporation is the surviving corporation and the shareholders and directors of the Corporation prior to the merger constitute a majority of the shareholders and directors, respectively, of the surviving corporation (or its parent)) or (ii) all or substantially all of the Corporation's assets determined on a consolidated basis.

(c)     For purposes of this Agreement, the term "<u>Cause</u>" shall mean:

(i)     conviction of a felony or a crime involving fraud or moral turpitude; or

(ii)     theft, material act of dishonesty or fraud, intentional falsification of any employment or Corporation records, or commission of any criminal act which impairs Employee's ability to perform appropriate employment duties for the Corporation; or

(iii)     intentional or reckless conduct or gross negligence materially harmful to the Corporation or the successor to the Corporation after a Change in Control Transaction, including violation of a non-competition or confidentiality agreement; or

(iv)     willful failure to follow lawful and reasonable instructions of the person or body to which Employee reports, which failure, if curable, is not cured within thirty (30) days after written notice to the Employee thereof; or

(v)     gross negligence or willful misconduct in the performance of Employee's assigned duties; or

(vi)     any material breach of this Agreement by Employee, which breach, if curable, is not cured within fifteen (15) days after written notice to the Employee of such breach.

6.     <u>Effects of Termination</u>.

(a)     Upon termination of the Employee's employment pursuant to Section 5(a)(i) or (ii), in addition to the accrued but unpaid compensation through the date of death or Total Disability and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee or his estate or beneficiaries, as applicable, shall be entitled to the following severance benefits: (i) continued provision for a period of twelve (12) months following the Employee's death  or Total Disability of benefits under Benefit Plans extended from time to time by the Corporation to its senior Employees; and (ii) payment on a pro-rated basis of any bonus or other payments earned in connection with any bonus plan to which the Employee was a participant as of the date of death or Total Disability earned prior to the date of termination.

(b)     Upon termination of the Employee's employment pursuant to Section 5(a)(iii), where the Corporation has offered to renew the term of the Employee's employment for an additional one (1) year period and the Employee chooses not to continue in the employ of the Corporation, the Employee shall be entitled to receive only the accrued but unpaid compensation through the date of termination and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date. In the event the Corporation tenders a Non-Renewal Notice to the Employee, then the Employee shall be entitled to the same severance benefits as if the Employee's employment were terminated pursuant to Section 5(a)(v); <u>provided</u>, <u>however</u>, if such Non-Renewal Notice was triggered due to the Corporation's statement that the Employee's employment was terminated due to Section 5(a)(vi) (for "Cause"), then payment of severance benefits will be contingent upon a determination as to whether termination was properly for "Cause."

(c)     Upon termination of the Employee's employment pursuant to Section 5(a)(v) or other than pursuant to Section 5(a)(i), 5(a)(ii), 5(a)(iii), 5(a)(iv), or 5(a)(vi) (i.e., without "Cause"), in addition to the accrued but unpaid compensation and vacation pay through the end of the Term or any then applicable extension of the Term and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee shall be entitled to the following severance benefits: (i) a cash payment, based on the current scale of Employee's Base Salary, equal to six months of Base Salary, to be paid in a single lump sum payment not later than sixty (60) days following such termination, less withholding of all applicable taxes; (ii) continued provision for a period of twelve (12) months after the date of termination of the benefits under Benefit Plans extended from time to time by the Corporation to its senior Employees; and (iii) payment on a pro-rated basis of any bonus or other payments earned in connection with any bonus plan to which the Employee was a participant as of the date of the Employee's termination of employment.  In addition, any options or restricted stock shall be immediately vested upon termination of Employee's employment pursuant to Section 5(a)(v) or by the Corporation without "Cause".

(d)     Upon termination of the Employee's employment pursuant to Section 5(a)(iv) or (vi), in addition to the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee shall be entitled to the following severance benefits: (i) accrued and unpaid Base Salary through the date of termination, less withholding of applicable taxes and any other benefits accrued to him under any Benefit Plans outstanding at such time; and (ii) continued provision, for a period of one (1) month after the date of the Employee's termination of employment, of benefits under Benefit Plans extended to the Employee at the time of termination.  Employee shall have any conversion rights available under the Corporation's Benefit Plans and as otherwise provided by law, including the Comprehensive Omnibus Budget Reconciliation Act.

(e)     Any payments required to be made hereunder by the Corporation to the Employee shall continue to the Employee's beneficiaries in the event of his death until paid in full.

7.     <u>Time Off.</u> In additional to standard holidays, the Employee shall be entitled to take reasonable amounts of time off for vacation, illness, and personal matters during which period his salary shall be paid in full. Discretionary absences of longer than one week should be scheduled at such time or times as the Employee and the Corporation shall determine is mutually convenient.

8.     <u>Disclosure of Confidential Information.</u>

(a) The Employee recognizes, acknowledges and agrees that he has had and will continue to have access to secret and confidential information regarding the Corporation, its subsidiaries and their respective businesses ("<u>Confidential Information</u>"), including but not limited to, its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans, provided such information (i) is not in or does not hereafter become part of the public domain, or (ii) became known to others through no fault of the Employee.  The Employee acknowledges that such information is of great

value to the Corporation, is the sole property of the Corporation, and has been and will be acquired by him in confidence.  In consideration of the obligations undertaken by the Corporation herein, the Employee will not, at any time, during or after his employment hereunder, reveal, divulge or make known to any person, any Confidential Information acquired by the Employee during the course of his employment, which is treated as confidential by the Corporation, and not otherwise in the public domain, except as required by law (but only after Employee has provided the Corporation with reasonable notice and opportunity to take action against any legally required disclosure. The provisions of this Section 8 shall survive the termination of the Employee's employment hereunder.

(b)     The Employee affirms that he does not possess and will not rely upon the protected trade secrets or confidential or proprietary information of any prior employer(s) in providing services to the Corporation or its subsidiaries, except his prior knowledge of Lighter Than Air Systems Corp. which was acquired by the Corporation.

(c)     In the event that the Employee's employment with the Corporation terminates for any reason, the Employee shall deliver forthwith to the Corporation any and all originals and copies, including those in electronic or digital formats, of Confidential Information; provided, however, Employee shall be entitled to retain (i) papers and other materials of a personal nature, including, but not limited to, photographs, correspondence, personal diaries, calendars and rolodexes, personal files and phone books, (ii) information showing his compensation or relating to reimbursement of expenses, (iii) information that he reasonably believes may be needed for tax purposes and (iv) copies of plans, programs and agreements relating to his employment, or termination thereof, with the Corporation.

(d)     Post-Termination Assistance. Upon the Employee's termination of employment with the Company, the Employee agrees to fully cooperate in all matters relating to the winding up or pending work on behalf of the Company and the orderly transfer of work to other employees of the Company following any termination of the Employees' employment. The Employee further agrees that Employee will provide, upon reasonable notice, such information and assistance to the Company as may reasonably be requested by the Company in connection with any audit, governmental investigation, litigation, or other dispute in which the Company is or may become a party and as to which the Employee has knowledge; provided, however, that (i) the Company agrees to reimburse the Employee for any related out-of-pocket expenses, including travel expenses, and (ii) any such assistance may not unreasonably interfere with Employee's then current employment.

(e)     No Mitigation or Set-Off. In no event shall the Employee be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Employee under any of the provisions of this Agreement and such amounts shall not be reduced, regardless of whether the Employee obtains other employment. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which the Company may have against the Employee or others; provided, however, the Company shall have the right to offset

the amount of any funds loaned or advanced to the Employee and not repaid against any severance obligations the Company may have to the Employee hereunder.

9.    <u>Non-Competition and Non-Solicitation</u>.

(a)    The Employee agrees and acknowledges that the Confidential Information that the Employee has already received and will receive is valuable to the Corporation and that its protection and maintenance constitutes a legitimate business interest of the Corporation, to be protected by the non-competition restrictions set forth herein. The Employee agrees and acknowledges that the non-competition restrictions set forth herein are reasonable and necessary and do not impose undue hardship or burdens on the Employee. The Employee also acknowledges that the Corporation's business is conducted worldwide (the "<u>Territory</u>"), and that the Territory, scope of prohibited competition, and time duration set forth in the non-competition restrictions set forth below are reasonable and necessary to maintain the value of the Confidential Information of, and to protect the goodwill and other legitimate business interests of, the Corporation, its affiliates and/or its clients or customers. The provisions of this Section 9 shall survive the termination of the Employee's employment hereunder for a period of one (1) year after the termination of Employee's employment for whatever reason, and regardless whether the termination is voluntary or involuntary, within the Territory.

(b)    The Employee hereby agrees and covenants that he shall not without the prior written consent of the Corporation, directly or indirectly, in any capacity whatsoever, including, without limitation, as an employee, employer, consultant, principal, partner, shareholder, officer, director or any other individual or representative capacity (other than (i) as a holder of less than two (2%) percent of the outstanding securities of a company whose shares are traded on any national securities exchange or (ii) as a limited partner, passive minority interest holder in a venture capital fund, private equity fund or similar investment entity which holds or may hold an equity or debt position in portfolio companies that are competitive with the Corporation; provided however, that the Employee shall be precluded from serving as an operating partner, general partner, manager or governing board designee with respect to such portfolio companies), whether on the Employee's own behalf or on behalf of any other person or entity or otherwise howsoever, during the Term and for a period of one (1) year after the termination of the Employee's employment for whatever reason, and regardless whether the termination in voluntary or involuntary, within the Territory.

(1)    Engage, own, manage, operate, control, be employed by, consult for, participate in, or be connected in any manner with the ownership, management, operation or control of any business in competition with the Business of the Corporation, as defined in the next sentence.  "<u>Business</u>" shall mean mobile satellite products and services sector of the global communications industry.

(2)    Recruit, solicit or hire, or attempt to recruit, solicit or hire, any employee, or independent contractor of the Corporation to leave the employment (or independent contractor relationship) thereof, whether or not any such employee or independent contractor is party to an employment agreement, for the purpose of competing with the Business of the Corporation.

(3)     Attempt in any manner to solicit or accept from any customer of the Corporation, with whom Employee had significant contact during Employee's employment by the Corporation (whether under this Agreement or otherwise), business competitive with the Business done by the Corporation with such customer or to persuade or attempt to persuade any such customer to cease to do business or to reduce the amount of business which such customer has customarily done with the Corporation, or if any such customer elects to move its business to a person other than the Corporation, provide any services of the kind or competitive with the Business of the Corporation for such customer, or have any discussions regarding any such service with such customer, on behalf of such other person for the purpose of competing with the Business of the Corporation; or

(4)     Interfere with any relationship, contractual or otherwise, between the Corporation and any other party, including, without limitation, any supplier, distributor, co-venturer or joint venturer of the Corporation, for the purpose of soliciting such other party to discontinue or reduce its business with the Corporation for the purpose of competing with the Business of the Corporation.

With respect to the activities described in Paragraphs (1), (2), (3) and (4) above, the restrictions of this Section 9 shall continue during the Employment Period and, upon termination of the Employee's employment for a period of one (1) year thereafter.

10.     <u>Intentionally Omitted</u>.

11.     <u>Section 409A</u>.

The provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") and any final regulations and guidance promulgated thereunder ("<u>Section 409A</u>") and shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A.  The Corporation and Employee agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Employee under Section 409A.

To the extent that Employee will be reimbursed for costs and expenses or in-kind benefits, except as otherwise permitted by Section 409A, (a) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, (b) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year; provided that the foregoing clause (b) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect and (c) such payments shall be made on or before the last day of the taxable year following the taxable year in which you incurred the expense.

A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or

following a termination of employment unless such termination constitutes a "Separation from Service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement references to a "termination," "termination of employment" or like terms shall mean Separation from Service.

Each installment payable hereunder shall constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b), including Treasury Regulation Section 1.409A-2(b)(2)(iii). Each payment that is made within the terms of the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) is intended to meet the "short-term deferral" rule. Each other payment is intended to be a payment upon an involuntary termination from service and payable pursuant to Treasury Regulation Section 1.409A-1(b)(9)(iii), et. seq., to the maximum extent permitted by that regulation, with any amount that is not exempt from Code Section 409A being subject to Code Section 409A.

Notwithstanding anything to the contrary in this Agreement, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination, then only that portion of the severance and benefits payable to Employee pursuant to this Agreement, if any, and any other severance payments or separation benefits which may be considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits"), which (when considered together) do not exceed the Section 409A Limit (as defined herein) may be made within the first six (6) months following Employee's termination of employment in accordance with the payment schedule applicable to each payment or benefit. Any portion of the Deferred Compensation Separation Benefits in excess of the Section 409A Limit otherwise due to Employee on or within the six (6) month period following Employee's termination will accrue during such six (6) month period and will become payable in one lump sum cash payment on the date six (6) months and one (1) day following the date of Employee's termination of employment. All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following termination but prior to the six (6) month anniversary of Employee's termination date, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of Employee's death and all other Deferred Compensation Separation Benefits will be payable in accordance with the payment schedule applicable to each payment or benefit.

For purposes of this Agreement, "Section 409A Limit" will mean a sum equal (x) to the amounts payable prior to March 15 following the year in which Employee terminations plus (y) the lesser of two (2) times: (i) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the Corporation's taxable year preceding the Corporation's taxable year of Employee's termination of employment as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any IRS guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

12.     <u>Miscellaneous.</u>

a.      The Employee acknowledges that the services to be rendered by him under the provisions of this Agreement are of a special, unique and extraordinary character and that it would be difficult or impossible to replace such services. Accordingly, the Employee agrees that any breach or threatened breach by him of Sections 8 or 9 of this Agreement shall entitle the Corporation, in addition to all other legal remedies available to it, to apply to any court of competent jurisdiction to seek to enjoin such breach or threatened breach. The parties understand and intend that each restriction agreed to by the Employee hereinabove shall be construed as separable and divisible from every other restriction, that the unenforceability of any restriction shall not limit the enforceability, in whole or in part, of any other restriction, and that one or more or all of such restrictions may be enforced in whole or in part as the circumstances warrant. In the event that any restriction in this Agreement is more restrictive than permitted by law in the jurisdiction in which the Corporation seeks enforcement thereof, such restriction shall be limited to the extent permitted by law. The remedy of injunctive relief herein set forth shall be in addition to, and not in lieu of, any other rights or remedies that the Corporation may have at law or in equity.

b.      Neither the Employee nor the Corporation may assign or delegate any of their rights or duties under this Agreement without the express written consent of the other; provided however that the Corporation shall have the right to delegate its obligation of payment of all sums due to the Employee hereunder, provided that such delegation shall not relieve the Corporation of any of its obligations hereunder.

c.      This Agreement constitutes and embodies the full and complete understanding and agreement of the parties with respect to the Employee's employment by the Corporation, supersedes all prior understandings and agreements, whether oral or written, between the Employee and the Corporation, and shall not be amended, modified or changed except by an instrument in writing executed by the party to be charged. The invalidity or partial invalidity of one or more provisions of this Agreement shall not invalidate any other provision of this Agreement. No waiver by either party of any provision or condition to be performed shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time.

d.      This Agreement shall inure to the benefit of, be binding upon and enforceable against, the parties hereto and their respective successors, heirs, beneficiaries and permitted assigns.

e.      The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

f.      All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, sent by registered or certified mail, return receipt requested, postage prepaid, or by private overnight mail service (e.g. Federal Express) to the party at the address set forth above or to such other address as either party may hereafter give notice of in accordance with the provisions hereof. Notices shall be deemed given on the sooner of the date actually received or the third business day after sending.

g.      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without reference to principles of conflicts of laws and each of the parties hereto irrevocably consents to the jurisdiction and venue of the federal and state courts located in the State of Florida.

h.      This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one of the same instrument. The parties hereto have executed this Agreement as of the date set forth above.

**CORPORATION**:

**ORBSAT CORP**

_____

By:   David Phipps

Title: Chief Executive Officer

**EMPLOYEE**:

_____

By: Thomas Seifert

Exhibit 10.26

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is made and entered into as of this 2nd day of June 2021 (the "Effective Date"), by and between **ORBSAT CORP**, a Nevada corporation with offices at 18851 N.E. 29th Ave, Suite 700, Aventura, FL 33180 (the " Corporation"),  and **THOMAS  SEIFERT** (the "Employee"), under the following circumstances:

RECITALS:

A. The Corporation desires to secure the services of the Employee upon the terms and conditions hereinafter set forth; and

B. The Employee desires to render services to the Corporation upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, the parties mutually agree as follows:

1. Employment. The Corporation hereby employs the Employee and the Employee hereby accepts employment as an Employee of the Corporation, subject to the terms and conditions set forth in this Agreement.

2. Duties. The Employee shall serve as **Chief Financial Officer, Secretary and Treasurer** of the Corporation, with such duties, responsibilities, and authority as are commensurate and consistent with his position, as may be, from time to time, assigned to him by the Board of Directors (the "Board") of the Corporation. During the Term (as defined in Section 3), the Employee shall devote all of his full business time and efforts to the performance of his duties hereunder unless otherwise authorized by the Board. Notwithstanding the foregoing, the expenditure of reasonable amounts of time by the Employee for the making of passive personal investments, the conduct of business affairs and charitable and professional activities shall be allowed, provided such activities do not materially interfere with the services required to be rendered to the Corporation hereunder and do not violate the restrictive covenants set forth in Section 9 below. Employee shall notify Corporation of any physical, mental or emotional incapacity resulting from injury, sickness or disease that affects Employee's ability to carry out the duties and responsibilities of Employee's position.

3. Term of Employment. The term of the Employee's employment hereunder, unless sooner terminated as provided herein (the "Initial Term"), shall be for a period of three (3) years commencing on the effective date of the Corporation's uplisting to a national stock exchange. The term of this Agreement shall automatically be extended for additional terms of one (1) year each (each a "Renewal Term") unless either party gives prior written notice of non-renewal to the other party no later than thirty (30) days prior to the expiration of the Initial Term (each a "Non-Renewal Notice"), or the then current Renewal Term, as the case may be. For purposes of this Agreement, the Initial Term and any Renewal Term are hereinafter collectively referred to as the "Term."

4. Compensation of Employee.

(a) The Corporation shall pay the Employee as compensation for his services hereunder, in monthly installments during the Term, the sum of $240,000 (the "Annual Base Salary"), less such deductions as shall be required to be withheld by applicable law and regulations and monthly advances against the salary. The Corporation shall review the Base Salary on an annual basis and has the right, but not the obligation, to increase it, but such salary shall not be decreased during the Term.

(b) In addition to the Base Salary set forth in Section 4(a), the Employee shall be entitled to receive an annual cash bonus if the Corporation meets or exceeds criteria adopted by the Compensation Committee of the Board of Directors (the "Compensation Committee") for earning bonuses which criteria shall be adopted by the Compensation Committee annually. Bonuses shall be paid by the Corporation to the Employee promptly after determination that the relevant targets have been met, it being understood that the attainment of any financial targets associated with any bonus shall not be determined until following the completion of the Corporation's annual audit and public announcement of such results and bonuses shall be paid promptly following the Corporation's announcement of earnings. Employee is entitled to receive any additional bonuses as determined by the Board and its Compensation Committee and to participate in any other executive compensation plans adopted by the Board.

(c) Equity Awards. Employee shall be eligible for such grants of awards under stock option or other equity incentive plans of the Corporation adopted by the Board and approved by the Corporation's stockholders (or any successor or replacement plan adopted by the Board and approved by the Corporation's stockholders) (the "Plan") as the Compensation Committee of the Corporation may from time to time determine (the "Share Awards"). Share Awards shall be subject to the applicable Plan terms and conditions, provided, however, that Share Awards shall be subject to any additional terms and conditions as are provided herein or in any award certificate(s), which shall supersede any conflicting provisions governing Share Awards provided under the Plan.

(d) The Corporation shall pay or reimburse the Employee for all reasonable out-of-pocket expenses actually incurred or paid by the Employee in the course of his employment, consistent with the Corporation's policy for reimbursement of expenses which may be modified from time to time without notice.

(e) The Employee shall be entitled to participate in such pension, profit sharing, group insurance, hospitalization, and group health and benefit plans and all other benefits and plans, including perquisites, if any, as the Corporation provides to its senior Employees (the "Benefit Plans").

5. Termination.

(a) This Agreement and the Employee's employment hereunder shall terminate upon the happening of any of the following events:

(i) upon the Employee's death;

(ii) upon the Employee's "Total Disability" (as defined in Section 22€(3) of the Internal Revenue Code of 1986, as amended);

(iii) upon the expiration of the Initial Term of this Agreement or any Renewal Term thereof, if either party has provided a timely notice of non-renewal in accordance with Section 3, above;

(iv) at the Employee's option, upon thirty (30) days prior written notice to the Corporation;

(v) at the Employee's option, in the event of an act by the Corporation, defined in Section 5(c), below, as constituting "Good Reason" for termination by the Employee; and

(vi) at the Corporation's option, in the event of an act by the Employee, defined in Section 5(d), below, as constituting "Cause" for termination by the Corporation.

**EXHIBIT  D**

(vii) Nothing in this Section 5(b) shall be construed to waive the Employee's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. s.2601 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. s12101*et seq.*

(b) For purposes of this Agreement, the term "Good Reason" shall mean that the Employee has resigned due to (i) a significant diminution of duties inconsistent with Employee's title, authority, duties and responsibilities, provided that Employee provides written notice of such resignation within five (5) business days of notification of such significant diminution of duties. Employee acknowledges that reassignment to an executive position in the Corporation or one of its subsidiaries does not meet the definition of a significant diminution of duties; (ii) any reduction of or failure to pay Employee compensation provided for herein, except to the extent Employee consents in writing prior to any reduction, deferral or waiver of compensation, which non-payment continues for a period of ten (10) days following written notice to the Corporation by Employee of such non-payment; (iii) any relocation of the principal location of Employee's employment outside of the State of Colorado or in a manner which makes remote work environment unfeasible without the Employee's prior written consent; (iv) at any time following the consummation of any Change in Control Transaction (as defined below); (vi) any material violation by the Corporation of its obligations under this Agreement that is not cured within thirty (30) days after receipt of written notice thereof from the Employee. For purposes of this Agreement, the term "Change in Control Transaction" means the sale of the Corporation or its predecessor to an un-affiliated person or entity or group of un-affiliated persons or entities pursuant to which such party or parties acquire (i) shares of capital stock of the Corporation representing at least fifty percent (50%) of outstanding capital stock or sufficient to elect a majority of the Board of the Corporation (whether by merger, consolidation, sale or transfer of shares (other than a merger where the Corporation is the surviving corporation and the shareholders and directors of the Corporation prior to the merger constitute a majority of the shareholders and directors, respectively, of the surviving corporation (or its parent)) or (ii) all or substantially all of the Corporation's assets determined on a consolidated basis.

(c) For purposes of this Agreement, the term "Cause" shall mean:

(i) conviction of a felony or a crime involving fraud or moral turpitude; or

(ii) theft, material act of dishonesty or fraud, intentional falsification of any employment or Corporation records, or commission of any criminal act which impairs Employee's ability to perform appropriate employment duties for the Corporation; or

(iii) intentional or reckless conduct or gross negligence materially harmful to the Corporation or the successor to the Corporation after a Change in Control Transaction, including violation of a non-competition or confidentiality agreement; or

(iv) willful failure to follow lawful and reasonable instructions of the person or body to which Employee reports, which failure, if curable, is not cured within thirty (30) days after written notice to the Employee thereof; or

(v) gross negligence or willful misconduct in the performance of Employee's assigned duties; or

(vi) any material breach of this Agreement by Employee, which breach, if curable, is not cured within fifteen (15) days after written notice to the Employee of such breach.

6. Effects of Termination.

(a) Upon termination of the Employee's employment pursuant to Section 5(a)(i) or (ii), in addition to the accrued but unpaid compensation through the date of death or Total Disability and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee or his estate or beneficiaries, as applicable, shall be entitled to the following severance benefits: (i) continued provision for a period of twelve (12) months following the Employee's death or Total Disability of benefits under Benefit Plans extended from time to time by the Corporation to its senior Employees; and (ii) payment on a pro-rated basis of any bonus or other payments earned in connection with any bonus plan to which the Employee was a participant as of the date of death or Total Disability earned prior to the date of termination.

(b) Upon termination of the Employee's employment pursuant to Section 5(a)(iii), where the Corporation has offered to renew the term of the Employee's employment for an additional one (1) year period and the Employee chooses not to continue in the employ of the Corporation, the Employee shall be entitled to receive only the accrued but unpaid compensation through the date of termination and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date. In the event the Corporation tenders a Non-Renewal Notice to the Employee, then the Employee shall be entitled to the same severance benefits as if the Employee's employment were terminated pursuant to Section 5(a)(v); provided, however, if such Non-Renewal Notice was triggered due to the Corporation's statement that the Employee's employment was terminated due to Section 5(a)(vi) (for "Cause"), then payment of severance benefits will be contingent upon a determination as to whether termination was properly for "Cause."

(c) Upon termination of the Employee's employment pursuant to Section 5(a)(v) or other than pursuant to Section 5(a)(i), 5(a)(ii), 5(a)(iii), 5(a)(iv), or 5(a)(vi) (i.e., without "Cause"), in addition to the accrued but unpaid compensation and vacation pay through the end of the Term or any then applicable extension of the Term and any other benefits accrued to him under any Benefit Plans outstanding at such time and the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee shall be entitled to the following severance benefits: (i) a cash payment, based on the current scale of Employee's Base Salary, equal to six months of Base Salary, to be paid in a single lump sum payment not later than sixty (60) days following such termination, less withholding of all applicable taxes; (ii) continued provision for a period of twelve (12) months following the date of termination of the benefits under Benefit Plans extended from time to time by the Corporation to its senior Employees; and (iii) payment on a pro-rated basis of any bonus or other payments earned in connection with any bonus plan to which the Employee was a participant as of the date of the Employee's termination of employment. In addition, any options or restricted stock shall be immediately vested upon termination of Employee's employment pursuant to Section 5(a)(v) or by the Corporation without "Cause".

(d) Upon termination of the Employee's employment pursuant to Section 5(a)(iv) or (vi), in addition to the reimbursement of documented, unreimbursed expenses incurred prior to such date, the Employee shall be entitled to the following severance benefits: (i) accrued and unpaid Base Salary through the date of termination, less withholding of applicable taxes and any other benefits accrued to him under any Benefit Plans outstanding at such time; and (ii) continued provision, for a period of one (1) month after the date of the Employee's termination of employment, of benefits under Benefit Plans extended to the Employee at the time of termination. Employee shall have any conversion rights available under the Corporation's Benefit Plans and as otherwise provided by law, including the Comprehensive Omnibus Budget Reconciliation Act.

(e) Any payments required to be made hereunder by the Corporation to the Employee shall continue to the Employee's beneficiaries in the event of his death until paid in full.

7. Time Off. In additional to standard holidays, the Employee shall be entitled to take reasonable amounts of time off for vacation, illness, and personal matters during which period his salary shall be paid in full. Discretionary absences of longer than one week should be scheduled at such time or times as the Employee and the Corporation shall determine is mutually convenient.

8. Disclosure of Confidential Information.

(a) The Employee recognizes, acknowledges and agrees that he has had and will continue to have access to secret and confidential information regarding the Corporation, its subsidiaries and their respective businesses ("Confidential Information"), including but not limited to, its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans, provided such information (i) is not in or does not hereafter become part of the public domain, or (ii) became known to others through no fault of the Employee. The Employee acknowledges that such information is of great value to the Corporation, is the sole property of the Corporation, and has been and will be acquired by him in confidence. In consideration of the obligations undertaken by the Corporation herein, the Employee will not, at any time, during or after his employment hereunder, reveal, divulge or make known to any person, any Confidential Information acquired by the Employee during the course of his employment, which is treated as confidential by the Corporation, and not otherwise in the public domain, except as required by law (but only after Employee has provided the Corporation with reasonable notice and opportunity to take action against any legally required disclosure. The provisions of this Section 8 shall survive the termination of the Employee's employment hereunder.

(b) The Employee affirms that he does not possess and will not rely upon the protected trade secrets or confidential or proprietary information of any prior employer(s) in providing services to the Corporation or its subsidiaries, except his prior knowledge of Lighter Than Air Systems Corp. which was acquired by the Corporation.

(c) In the event that the Employee's employment with the Corporation terminates for any reason, the Employee shall deliver forthwith to the Corporation any and all originals and copies, including those in electronic or digital formats, of Confidential Information; provided, however, Employee shall be entitled to retain (i) papers and other materials of a personal nature, including, but not limited to, photographs, correspondence, personal diaries, calendars and rolodexes, personal files and phone books, (ii) information showing his compensation or relating to reimbursement of expenses, (iii) information that he reasonably believes may be needed for tax purposes and (iv) copies of plans, programs and agreements relating to his employment, or termination thereof, with the Corporation.

(d) Post-Termination Assistance. Upon the Employee's termination of employment with the Company, the Employee agrees to fully cooperate in all matters relating to the winding up or pending work on behalf of the Company and the orderly transfer of work to other employees of the Company following any termination of the Employees' employment. The Employee further agrees that Employee will provide, upon reasonable notice, such information and assistance to the Company as may reasonably be requested by the Company in connection with any audit, governmental investigation, litigation, or other dispute in which the Company is or may become a party and as to which the Employee has knowledge; provided, however, that (i) the Company agrees to reimburse the Employee for any related out-of-pocket expenses, including travel expenses, and (ii) any such assistance may not unreasonably interfere with Employee's then current employment.

(e) No Mitigation or Set-Off. In no event shall the Employee be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Employee under any of the provisions of this Agreement and such amounts shall not be reduced, regardless of whether the Employee obtains other employment. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which the Company may have against the Employee or others; provided, however, the Company shall have the right to offset the amount of any funds loaned or advanced to the Employee and not repaid against any severance obligations the Company may have to the Employee hereunder.

9. Non-Competition and Non-Solicitation.

(a) The Employee agrees and acknowledges that the Confidential Information that the Employee has already received and will receive is valuable to the Corporation and that its protection and maintenance constitutes a legitimate business interest of the Corporation, to be protected by the non-competition restrictions set forth herein. The Employee agrees and acknowledges that the non-competition restrictions set forth herein are reasonable and necessary and do not impose undue hardship or burdens on the Employee. The Employee also acknowledges that the Corporation's business is conducted worldwide (the "Territory"), and that the Territory, scope of prohibited competition, and time duration set forth in the non-competition restrictions set forth below are reasonable and necessary to maintain the value of the Confidential Information of, and to protect the goodwill and other legitimate business interests of, the Corporation, its affiliates and/or its clients or customers. The provisions of this Section 9 shall survive the termination of the Employee's employment hereunder for a period of one (1) year after the termination of Employee's employment for whatever reason, and regardless whether the termination is voluntary or involuntary, within the Territory.

(b) The Employee hereby agrees and covenants that he shall not without the prior written consent of the Corporation, directly or indirectly, in any capacity whatsoever, including, without limitation, as an employee, employer, consultant, principal, partner, shareholder, officer, director or any other individual or representative capacity (other than (i) as a holder of less than two (2%) percent of the outstanding securities of a company whose shares are traded on any national securities exchange or (ii) as a limited partner, passive minority interest holder in a venture capital fund, private equity fund or similar investment entity which holds or may hold an equity or debt position in portfolio companies that are competitive with the Corporation; provided however, that the Employee shall be precluded from serving as an operating partner, general partner, manager or governing board designee with respect to such portfolio companies), whether on the Employee's own behalf or on behalf of any other person or entity or otherwise howsoever, during the Term and for a period of one (1) year after the termination of the Employee's employment for whatever reason, and regardless whether the termination is voluntary or involuntary, within the Territory.

(1) Engage, own, manage, operate, control, be employed by, consult for, participate in, or be connected in any manner with the ownership, management, operation or control of any business in competition with the Business of the Corporation, as defined in the next sentence. "Business" shall mean mobile satellite products and services sector of the global communications industry.

(2) Recruit, solicit or hire, or attempt to recruit, solicit or hire, any employee, or independent contractor of the Corporation to leave the employment (or independent contractor relationship) thereof, whether or not any such employee or independent contractor is party to an employment agreement, for the purpose of competing with the Business of the Corporation.

(3) Attempt in any manner to solicit or accept from any customer of the Corporation, with whom Employee had significant contact during Employee's employment by the Corporation (whether under this Agreement or otherwise), business competitive with the Business done by the Corporation with such customer or to persuade or attempt to persuade any such customer to cease to do business or to reduce the amount of business which such customer has customarily done with the Corporation, or if any such customer elects to move its business to a person other than the Corporation, provide any services of the kind or competitive with the Business of the Corporation for such customer, or have any discussions regarding any such service with such customer, on behalf of such other person for the purpose of competing with the Business of the Corporation; or

(4) Interfere with any relationship, contractual or otherwise, between the Corporation and any other party, including, without limitation, any supplier, distributor, co-venturer or joint venturer of the Corporation, for the purpose of soliciting such other party to discontinue or reduce its business with the Corporation for the purpose of competing with the Business of the Corporation.

With respect to the activities described in Paragraphs (1), (2), (3) and (4) above, the restrictions of this Section 9 shall continue during the Employment Period and,

upon termination of the Employee's employment for a period of one (1) year thereafter.

      10. Intentionally Omitted.

      11. Section 409A.

      The provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and any final regulations and guidance promulgated thereunder ("Section 409A") and shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. The Corporation and Employee agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Employee under Section 409A.

      To the extent that Employee will be reimbursed for costs and expenses or in-kind benefits, except as otherwise permitted by Section 409A, (a) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, (b) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year; provided that the foregoing clause (b) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect and (c) such payments shall be made on or before the last day of the taxable year following the taxable year in which you incurred the expense.

      A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination constitutes a "Separation from Service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement references to a "termination," "termination of employment" or like terms shall mean Separation from Service.

      Each installment payable hereunder shall constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b), including Treasury Regulation Section 1.409A-2(b)(2)(iii). Each payment that is made within the terms of the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) is intended to meet the "short-term deferral" rule. Each other payment is intended to be a payment upon an involuntary termination from service and payable pursuant to Treasury Regulation Section 1.409A-1(b)(9)(iii), et. seq., to the maximum extent permitted by that regulation, with any amount that is not exempt from Code Section 409A being subject to Code Section 409A.

      Notwithstanding anything to the contrary in this Agreement, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination, then only that portion of the severance and benefits payable to Employee pursuant to this Agreement, if any, and any other severance payments or separation benefits which may be considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits"), which (when considered together) do not exceed the Section 409A Limit (as defined herein) may be made within the first six (6) months following Employee's termination of employment in accordance with the payment schedule applicable to each payment or benefit. Any portion of the Deferred Compensation Separation Benefits in excess of the Section 409A Limit otherwise due to Employee on or within the six (6) month period following Employee's termination will accrue during such six (6) month period and will become payable in one lump sum cash payment on the date six (6) months and one (1) day following the date of Employee's termination of employment. All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following termination but prior to the six (6) month anniversary of Employee's termination date, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of Employee's death and all other Deferred Compensation Separation Benefits will be payable in accordance with the payment schedule applicable to each payment or benefit.

      For purposes of this Agreement, "Section 409A Limit" will mean a sum equal (x) to the amounts payable prior to March 15 following the year in which Employee terminations plus (y) the lesser of two (2) times: (i) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the Corporation's taxable year preceding the Corporation's taxable year of Employee's termination of employment as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any IRS guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

      12. Miscellaneous.

      a. The Employee acknowledges that the services to be rendered by him under the provisions of this Agreement are of a special, unique and extraordinary character and that it would be difficult or impossible to replace such services. Accordingly, the Employee agrees that any breach or threatened breach by him of Sections 8 or 9 of this Agreement shall entitle the Corporation, in addition to all other legal remedies available to it, to apply to any court of competent jurisdiction to seek to enjoin such breach or threatened breach. The parties understand and intend that each restriction agreed to by the Employee hereinabove shall be construed as separable and divisible from every other restriction, that the unenforceability of any restriction shall not limit the enforceability, in whole or in part, of any other restriction, and that one or more or all of such restrictions may be enforced in whole or in part as the circumstances warrant. In the event that any restriction in this Agreement is more restrictive than permitted by law in the jurisdiction in which the Corporation seeks enforcement thereof, such restriction shall be limited to the extent permitted by law. The remedy of injunctive relief herein set forth shall be in addition to, and not in lieu of, any other rights or remedies that the Corporation may have at law or in equity.

      b. Neither the Employee nor the Corporation may assign or delegate any of their rights or duties under this Agreement without the express written consent of the other; provided however that the Corporation shall have the right to delegate its obligation of payment of all sums due to the Employee hereunder, provided that such delegation shall not relieve the Corporation of any of its obligations hereunder.

      c. This Agreement constitutes and embodies the full and complete understanding and agreement of the parties with respect to the Employee's employment by the Corporation, supersedes all prior understandings and agreements, whether oral or written, between the Employee and the Corporation, and shall not be amended, modified or changed except by an instrument in writing executed by the party to be charged. The invalidity or partial invalidity of one or more provisions of this Agreement shall not invalidate any other provision of this Agreement. No waiver by either party of any provision or condition to be performed shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time.

      d. This Agreement shall inure to the benefit of, be binding upon and enforceable against, the parties hereto and their respective successors, heirs, beneficiaries and permitted assigns.

      e. The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

      f. All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, sent by registered or certified mail, return receipt requested, postage prepaid, or by private overnight mail service (e.g. Federal Express) to the party at the address set forth above or to such other address as either party may hereafter give notice of in accordance with the provisions hereof. Notices shall be deemed given on the sooner of the date actually received or the third business day after sending.

g. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without reference to principles of conflicts of laws and each of the parties hereto irrevocably consents to the jurisdiction and venue of the federal and state courts located in the State of Florida.

h. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one of the same instrument. The parties hereto have executed this Agreement as of the date set forth above.

**CORPORATION**:

**ORBSAT CORP**

*/s/ David Phipps*
_____
By:      David Phipps
Title:   Chief Executive Officer

**EMPLOYEE**:

*/s/ Thomas Seifert*
_____
By:      Thomas Seifert