## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:21-cv-22436-GAYLES/TORRES

NEXTPLAT CORP. f/k/a ORBSAT CORP.,

      Plaintiff,

v.

THOMAS SEIFERT,

      Defendant.

_____/

THOMAS SEIFERT,

      Counter-Plaintiff,

v.

NEXTPLAT CORP. f/k/a ORBSAT CORP.
and CHARLES M. FERNANDEZ,

      Counter-Defendants.

_____/

## REPORT AND RECOMMENDATION ON
## COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      This matter is before the Court on Counter-Defendants, Nextplat Corp.'s and

Charles M. Fernandez's ("Nextplat," "Mr. Fernandez," and "Counter-Defendants")

motion for summary judgment [D.E. 147] against Counter-Plaintiff, Thomas Seifert's

("Counter-Plaintiff" or "Mr. Seifert") counterclaims. Mr. Seifert filed a response to

Counter-Defendants' motion on February 5, 2024 [D.E. 202], to which Counter-

Defendants replied on February 12, 2024. [D.E. 207]. The motion, therefore, is ripe

1

for disposition. After careful consideration of the briefing materials, the evidence of record, the relevant authorities, and for the reasons discussed below, we hereby RECOMMEND that Counter-Defendants' Motion be DENIED.[1]

## I.    BACKGROUND

Mr. Seifert's counterclaims arise out of his termination as Nextplat's Chief Financial Officer ("CFO"). In response to his termination, and in response to Nextplat's Second Amended Complaint [D.E. 73], Mr. Seifert asserted five counterclaims. [D.E. 75]. Two of those counterclaims were disposed of via Nextplat's motion to dismiss [D.E. 176], and one is not at issue given Nextplat's concession. [D.E. 147 at 2, n.1]. Counter-Defendants now seek summary judgment against the two remaining counterclaims: (1) Nextplat's breach of the June 2, 2021 employment agreement between Nextplat and Mr. Seifert ("Employment Agreement") and (2) Nextplat's violation of the Florida Whistleblower Act (§ 448.102, Fla. Stat.).

Mr. Seifert was hired as Nextplat's CFO on October 13, 2020. On June 2, 2021, Nextplat and Mr. Seifert entered into the operative Employment Agreement. That agreement permitted Nextplat to terminate Mr. Seifert "for cause." The permitted "causes" material to this dispute are: (1) "gross negligence," (2) "willful misconduct," and (3) "willful failure to follow lawful and reasonable instructions of the person or body to which [Mr. Seifert] reports." [D.E. 75-2 at 4].

There are two main instances that Nextplat believes to have provided it "cause" to terminate Mr. Seifert: a $45,000.00 wire Mr. Seifert sent in response to a phishing

---

[1] On December 4, 2023, the Honorable Darrin P. Gayles referred this motion to the Undersigned Magistrate Judge for a report and recommendation. [D.E. 183].

scam ("the Phishing Wire"), and Mr. Seifert's response to his Notice of Suspension of Employment ("Notice of Suspension"). Mr. Seifert, meanwhile, believes that those two instances are merely pretext for the true reason he was terminated: his refusal to administer an ostensibly-illegal wire transfer to Mr. Fernandez's (Nextplat's Chief Operating Officer ("COO")) personal attorney ("the Retainer Wire").

### A. *The Phishing Wire*

On May 26, 2021, Mr. Seifert received wire instructions from Nasdaq. Those instructions directed Nexplat to wire to Nasdaq $45,000.00. Both parties agree that Mr. Phipps (Nextplat's corporate representative and Chief Executive Officer ("CEO")), gave Mr. Seifert authorization to send that wire. However, on May 27, 2021, Mr. Seifert received a new email from a different email address purporting to be associated with Nasdaq. The May 27 email contained different wire instructions (as compared to the May 26 e-mail) and included a new account manager, but requested the same amount of money in connection with the same underlying matter. Mr. Seifert, believing he had approval and without seeing the need to scrutinize the May 27 wire instructions, wired $45,000.00 per the instructions provided in the May 27 email. Mr. Seifert also asserts that on the morning of May 27, Mr. Phipps once again instructed him to send the wire.

On June 16, 2021, Mr. Seifert and Nextplat became aware that Nasdaq never received the $45,000.00—the May 27 email was a phishing scam. In the interim nineteen days (i.e., May 28 through June 15), Nextplat contends that Mr. Seifert ignored multiple emails and calls regarding Nasdaq's non-receipt of the wire.

Nextplat also contends that Mr. Seifert violated internal procedure because he failed to call the number contained in the May 27 email prior to sending the wire; failed to call Nasdaq to confirm the wiring instructions prior to sending the wire; failed to call Nasdaq to confirm the wire had been received; and did not otherwise follow up to confirm receipt of the wire. Mr. Seifert, meanwhile, argues that Nextplat had no policy requiring those actions. All that was required, Mr. Seifert asserts, was approval from Mr. Phipps, which Mr. Seifert received on May 26 and, disputedly, again on May 27.

### B. *Mr. Seifert's Notice of Suspension*

On June 21, 2021, Nextplat sent Mr. Seifert a Notice of Suspension. The Notice dictated that Mr. Seifert's administration of the Phishing Wire "constitute[d] reckless conduct and gross negligence materially harmful to the Corporation . . . ." [D.E. 75-6]. In response, on June 22, Mr. Seifert characterized the Notice of Suspension as "disingenuous at best," and as a "transparent attempt to justify my firing without good cause." [D.E. 146-24 at 1]. Further, Mr. Seifert responded that "any court [would] agree" that the reasons provided in the Notice of Suspension were pretextual, and that Nextplat would "hear from [his] counsel shortly." [*Id.*]. Mr. Seifert was terminated on that same day.

### C. *The Retainer Wire*

In between the Phishing Wire and Mr. Seifert's termination came another controversial wire: the Retainer Wire. On June 12, 2021, Mr. Fernandez emailed Mr. Seifert a request to send a $25,000.00 retainer payment to an attorney, Mr. Phillips.

In a time leading up to June 12, Mr. Phillips had negotiated Mr. Fernandez's CEO employment agreement with Nextplat on Mr. Fernandez's behalf. Mr. Fernandez's email did not specify for what services the Retainer Wire was compensating Mr. Phillips. Consequently, also on June 12, Mr. Seifert informed Mr. Fernandez that he was not comfortable sending the Retainer Wire, primarily because of the apparent conflict of interest. Within three minutes, Mr. Fernandez emailed Mr. Seifert back: "No problem. I was going to use him to complete our Texas acquisition. We won't use him." [D.E. 146-21].

But later that afternoon, the tides changed. Mr. Fernandez and Mr. Phipps called Mr. Seifert, and allegedly criticized him for refusing to send the Retainer Wire, accused him of insubordination, and threatened to immediately terminate him if he did not provide a written apology. As a result, Mr. Seifert issued what he considered a forced written apology to keep his job.

That very same day, Mr. Phipps called Ms. Carlise (Nextplat's former CFO) three separate times, sent two emails, and called her again on June 14. When Mr. Seifert caught wind of this, he asked Mr. Phipps if Nextplat was considering bringing back Ms. Carlise; Mr. Phipps responded that there was talk of that, but that he hadn't her (even though, in fact, he had called her several times). Then, on June 20, Ms. Carlise was hired for a position that, by design and per Ms. Carlise's preference, had no contact with Mr. Seifert. The next day, Mr. Seifert was suspended, and the day after that, Mr. Seifert was terminated.

Around the same time, on June 17, Mr. Uddin—who apparently shared a mutual friend with Mr. Fernandez—learned from that friend that Nextplat was "looking for a CFO" (i.e., Mr. Seifert's position) and applied accordingly. [D.E. 200 at 11:19-24].

## II.    APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.   ANALYSIS

We will address in turn Mr. Seifert's counterclaims for breach of contract and violation of the Florida Whistleblower Act.

### A. *Breach of Contract Counterclaim*

Mr. Seifert's breach of contract counterclaim centers on whether he was fired "for cause" under the Employment Agreement. Because there is a genuine dispute of material fact as to whether Mr. Seifert was terminated "for cause," summary judgment should be denied.

Nextplat argues that Mr. Seifert was fired "for cause" for two separate reasons. First, Nextplat argues that Mr. Seifert acted with "gross negligence" and committed "willful misconduct" when he errantly sent the $45,000.00 Phishing Wire. The Employment Agreement defines as cause (in part) "gross negligence or willful misconduct in the performance of Employee's assigned duties." [D.E. 75-2 at § 5(c)(v)]. Nextplat argues that because Mr. Seifert ostensibly ignored internal procedure before sending the Phishing Wire (i.e., did not confirm the wire instructions, call the recipient, confirm the receipt of the wire, or timely report the wrongful conduct), Mr. Seifert acted grossly negligent and/or committed willful misconduct. Accordingly,

Nextplat believes it had sufficient "cause" under the Employment Agreement to terminate Mr. Seifert.

Separately, Nextplat also argues it had cause to terminate Mr. Seifert because he ostensibly refused to cooperate with Nextplat's investigation of the Phishing Wire. The Employment Agreement includes as "cause" the "willful failure to follow lawful and reasonable instructions of the person or body to which the Employee reports." [D.E. 75-2 at § 5(c)(iv)]. On June 21, 2021, Nextplat sent to Mr. Seifert a Notice of Suspension of Employment based on the Phishing Wire. The Notice of Suspension informed Mr. Seifert that Nextplat "expect[ed] [Mr. Seifert] to cooperate with [Nextplat's] investigation into the Wire Transfer." [D.E. 75-6]. In response, Mr. Seifert informed Nextplat that the suspension was "disingenuous," and that Nextplat "would hear from [Mr. Seifert's] counsel shortly." Nextplat interprets Mr. Seifert's response as a "willful failure" to participate in the investigation, and therefore argues that Nextplat had "cause" to terminate Mr. Seifert.

Mr. Seifert, meanwhile, argues that his administration of the Phishing Wire did not raise to the level of gross negligence or willful misconduct. No wire transfer policy requiring phone calls and follow-ups existed, argues Mr. Seifert; all that was required was approval from Mr. Phipps, which Mr. Seifert received on May 26 and May 27. Mr. Seifert concludes that, by Mr. Phipps' own admission, Mr. Seifert did not act to intentionally harm Nextplat when he administered the Phishing Wire. At a minimum, Mr. Seifert argues, there is a genuine dispute of fact as to whether he acted grossly negligent or engaged in willful misconduct.

Moreover, Mr. Seifert argues that he did in fact participate in an investigation of the Phishing Wire. Further, he posits that regardless of whether Nextplat frames as a "cause" his alleged failure to cooperate in the investigation, Mr. Seifert's termination had been afoot since long before the Phishing Wire.

We will address in turn Nextplat's arguments for gross negligence, willful misconduct, and willful failure to participate in the investigation of the Phishing Wire. As to this "for cause" breach of contract analysis, we set aside Mr. Seifert's pretext arguments. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998) (rejecting consideration of a pretext argument "[b]ecause any ulterior, improper motive McDonald's have had to terminate the contract is irrelevant where a legitimate reason exists for doing so under the contract.").

### 1.   *Gross Negligence*

To begin, "[g]ross negligence . . . is defined as an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Bos. ex rel. Est. of Jackson v. Publix Super Markets, Inc.*, 112 So. 3d 654, 659 (Fla. 4th DCA 2013) (citing *Eller v. Shova*, 630 So. 2d 537, 541 n.3 (Fla. 1993)). Further, Florida law is clear that "[w]hether negligence is ordinary or gross is a question to be resolved by the jury." *Dep't of Agric. & Consumer Servs. v. Shuler Ltd. P'ship*, 139 So. 3d 914, 915 (Fla. 1st DCA 2014); *see also Hodges v. Helm*, 222 So. 2d 418, 420 (Fla. 1969) ("Whether . . . a composite situation evidences gross negligence is a jury question . . . ."); *MacGregor v. Daytona Int'l Speedway, LLC*, 263 So. 3d 151, 153 (Fla. 5th DCA 2018) (same).

9

Here, Nextplat does not proffer sufficient evidence to (1) show that Mr. Seifert knew that his actions would likely cause injury, or (2) undermine Florida's clear preference for a jury to decide the issue of gross negligence. Nextplat's primary argument is that, by not comparing the May 27 wire instructions to the May 26 wire instructions; not calling Nasdaq to confirm wire instructions; not confirming receipt of the wire; and not following up on a regular basis to confirm receipt of the wire, Mr. Seifert was grossly negligent.

It is quite possible that Mr. Seifert acted below the standard of reasonable care for a CFO—but the Employment Agreement does not contemplate ordinary negligence as a "cause." At this stage, resolving all reasonable factual inferences in favor of Mr. Seifert, the evidence is insufficient to show that Mr. Seifert knew his handling of the Phishing Wire would likely result in injury to Nextplat. From Mr. Seifert's perspective, he thought he was acting in accordance with Mr. Phipps' May 26 instructions to send the wire. Further, Mr. Seifert believes that on May 27, he received verbal instructions once again from Mr. Phipps to send the wire. The fact that Mr. Seifert did not take further care to confirm the May 27 wire instructions or to timely contact Nasdaq to confirm receipt very well might be negligent. But whether he was grossly negligent is, in light of the summary judgment standard and Florida law, a question most appropriate for a jury. It is clearly not susceptible to a finding by the Court as a matter of law.

Accordingly, because here, "the line separating simple and gross negligence is . . . indistinct," the question should be submitted to a jury and the motion denied.

*Courtney v. Florida Transformer, Inc.*, 549 So. 2d 1061, 1065 (Fla. 1st DCA 1989); *see also Hager v. Live Nation Motor Sports, Inc.*, 665 F. Supp. 2d 1290, 1294 (S.D. Fla. 2009) (denying summary judgment because "in close cases, the question of whether conduct amounts to gross negligence is a question that should be left to the jury."); *see, e.g., Agnelli v. Lennox Miami Corp.*, No. 20-22800-CIV, 2022 WL 426614, at *4–5 (S.D. Fla. Feb. 11, 2022) (denying summary judgment on contract claim under for cause termination provision, even though plaintiff offered "very limited evidence," because "[l]ooking at the evidence in the light most favorable to [plaintiff] the Court finds that the propriety of [his] expenditures is an issue of fact that should be decided by the trier of fact.").

## 2.    *Willful Misconduct*

Similarly, there is not sufficient evidence at this stage to demonstrate willful misconduct. Willful misconduct requires the exercise of even less care than gross negligence. *See Farrell v. Fisher*, 578 So. 2d 407, 409 (Fla. 4th DCA 1991) (finding that willful misconduct is more egregious than both gross negligence and wanton negligence); *see also Gregory v. McKesson & Robbins*, 54 So. 2d 682, 686 (Fla. 1951) ("Mere negligence and even gross negligence fall short of being wilful misconduct."). Willful misconduct "involves conduct of a quasi criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its probable consequences." *Id.*

Here, applying the same factual analysis as gross negligence, there is at least a genuine dispute as to whether Mr. Seifert knew his handling of the Phishing Wire

would likely injure Nextplat. While Mr. Seifert could likely have performed better under the circumstances, failing to confirm wire instructions that were apparently approved by the CEO the day before and the morning of does not equate to "conduct of a quasi criminal nature." *Id*. To that end, Mr. Phipps conceded at his deposition that Mr. Seifert did not engage in intentional misconduct when he sent the Phishing Wire. [D.E. 145-1 at 117:1–4] (Q: "Did [Mr. Seifert] engage in intentional misconduct [when he sent the Phishing wire]?" A: "Not intentional.").

Accordingly, based on Mr. Seifert's perhaps errant, but not intentionally-harmful behavior, coupled with Mr. Phipps' statement under oath that Mr. Seifert did not engage in intentional misconduct, a reasonable jury could certainly find that Mr. Seifert did not engage in willful misconduct. *See McCoy v. Durden*, 155 So. 3d 399, 407 (Fla. 1st DCA 2014) (reversing summary judgment where "the trial court subjugated the role of the jury to determine issues of fact as to the commission of 'willful misconduct'"); *Taylor v. Wellington Station Condo. Ass'n, Inc.*, 633 So. 2d 43, 44 (Fla. 5th DCA 1994) (reversing summary judgment because "willfulness was placed into issue by the [movant] and the issue is one for the jury").

### 3.   *Unwillingness to Participate in Investigation*

Lastly, we address Nextplat's argument that Mr. Seifert refused Nextplat's instruction to participate in its investigation of the Phishing Wire.

The Employment Agreement posits that Mr. Seifert may be fired "for cause" if he exhibits a "willful failure to follow lawful and reasonable instructions of the person or body to which the Employee reports." [D.E. 75-2 at § 5(c)(iv)]. Nextplat argues that,

because Mr. Seifert refused to participate in Nextplat's investigation of the Phishing Wire (as required by the Notice of Suspension), Nextplat possessed "cause" to fire Mr. Seifert.

At its base, this issue hinges on (1) whether Nextplat's instruction was "reasonable," and (2) if so, whether Mr. Seifert failed to follow that instruction. The exact instruction was: "We expect you to cooperate with Corporation's investigation into the Wire Transfer . . . ." [D.E. 75-6]. The context in which this request was made supports a genuine dispute as to whether Nextplat's instructions were reasonable. For example, on June 12, 2021 (before Nextplat learned of the Phishing Wire), Nextplat began an active quest to court Mr. Seifert's replacement in the form of Ms. Carlise, Nextplat's former CFO, and Mr. Uddin, an applicant for the CFO position. Also on June 12, Nextplat threatened to terminate Mr. Seifert if he did not provide a written apology for his refusal to send the conflict-of-interest-laden Retainer Wire. Then, on June 18, 2021 (three days *prior to* the Notice of Suspension), Nextplat sent to Mr. Seifert a Release and Severance Agreement seeking to terminate him.

While it may not be unheard of for an employer to require an employee's cooperation post-termination, Mr. Seifert raises a genuine dispute of fact that, given the circumstances, to request Mr. Seifert's cooperation was unreasonable. He had already been served a release and severance, his replacement had already been sought out, his termination had already been threatened, and he had already been suspended.

Further, at least to some extent, Mr. Seifert argues that he did participate in an investigation of the Phishing Wire. On June 16 (i.e., the date on which Mr. Seifert learned the Phishing Wire was in fact errant), Mr. Seifert contends that he immediately notified Mr. Phipps, undertook an investigation of what happened, and shortly after, also notified Mr. Fernandez.

To reiterate, we must resolve all reasonable factual inferences in favor of Mr. Seifert. Accordingly, given that there is a genuine dispute as to whether the instruction was reasonable, and as to whether Mr. Seifert participated in an investigation of the Phishing Wire, a reasonable jury could find that there lacked "cause" to terminate Mr. Seifert. The motion as to the breach of contract counterclaim should thus be denied in all respects.

### B. _Florida Whistleblower Act Counterclaim_

Mr. Seifert also claims that Nextplat violated the Florida Whistleblower Act ("FWA") when it terminated Mr. Seifert. The relevant portion of § 448.102 provides that:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

Fla. Stat. § 448.102(3). "Florida enacted the FWA 'to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public.'" _Steenback v. Fed. Express Corp._, No. 12-61515-CIV 2013 WL 12085475, at *4 (S.D. Fla. Aug. 21, 2013) (quoting _Golf Channel v. Jenkins_, 752 So. 2d 561, 562 (Fla. 2000)).

As a result, "the FWA is construed liberally in favor of granting access to the remedy." *Id*.

A claim under the FWA requires a plaintiff to prove that "(1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between the two events." *Rice-Lamar v. City of Fort Lauderdale*, 853 So. 2d 1125, 1132-33 (Fla. 4th DCA 2003); *see also Steenback,* 2013 WL 12085475, at *4. Akin to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), if the plaintiff establishes a *prima facie* case of causation, "the burden shifts to the employer to articulate a legitimate reason for the employment action." *Rice-Lamar*, 853 So. 2d at 1132. Then, "[i]f a legitimate reason is presented, the burden shifts back to the plaintiff to show that the employer's reason was pretextual." *Id.*

### 1.    *Protected Activity*

Mr. Seifert argues that, when Nextplat requested he send the Retainer Wire, Nextplat was requesting he engage in activity that violated "federally mandated . . . strict accounting controls and regular auditing and financial reporting requirements." [D.E. 202 at 10]. More specifically, Mr. Seifert argues that the Retainer Wire would have implicated a conflict of interest because it was directed by Mr. Gonzalez and (according to Mr. Seifert) was for the benefit of Mr. Gonzalez's personal attorney. Part of the reason why Mr. Seifert was concerned about the Retainer Wire, he argues, was because of his awareness of applicable SEC rules. [D.E. 153-1 at ¶44]. Accordingly, without a proper airing of the conflict and proper documentation of an arms-length transaction, it would violate the law that one must

"devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are executed in accordance with management's general or specific authorization." 15 U.S.C. § 78m(b)(2)(iii). Further, "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls . . . ." 15 U.S.C. § 78m(b)(5).[2]

Conversely, Nextplat argues that Mr. Seifert did not satisfy the "protected activity" prong because his refusal to send the Retainer Wire was not based on a perceived violation of the law, but merely internal policy. Further, Nextplat argues that the Retainer Wire would not have violated § 78m(b)(2)(iii) because the Retainer Wire was not going to be used to compensate Mr. Phillips (the attorney) for his personal representation of Mr. Fernandez. Rather, it would be used to retain Mr. Phillips for Nextplat's apparent upcoming Texas acquisition.

In the light most favorable to Mr. Seifert, at the time Mr. Fernandez requested Mr. Seifert send the Retainer Wire, a conflict of interest was afoot. Even Mr. Phipps agreed that he "wouldn't have approved [the Retainer Wire] because it would have needed further investigation . . . and documentation." [D.E. 145 at 209:12–210:17].

The question that follows, then, is whether Mr. Seifert objected to the Retainer Wire on the basis that it violated the law, or merely because it violated internal

---

[2] Mr. Seifert also seems to incorporate the latter part of 15 U.S.C. § 78m(b)(5), which prohibits one from "knowingly falsify[ing] any book, record, or account described in paragraph (2)." However, because Mr. Seifert does not put forth meaningful argument or evidence that he was asked to falsify a record, the argument will not be considered. *See Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 n.16 (11th Cir. 2021) (where a party does not "support [his] arguments with sufficient detail"—including with "significant discussion"—courts "consider these arguments abandoned and do not consider them.").

procedure. The FWA includes as protected activity "object[ions] to, or refus[als] to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." § 448.102(3). A company's internal procedures, standing alone, do not fall within the ambit of "law, rule, or regulation." *See, e.g., Morin v. Day & Zimmermann NPS, Inc.*, 2008 WL 2543432, at *2 (S.D. Fla. Jun. 25, 2008) (holding that an objection to a violation of an employer's internal procedure did not qualify as protected activity); *Little v. Foster Wheeler Constructors, Inc.*, 2010 WL 2035546, at *9 (S.D. Fla. May 24, 2010) (same); *Lawson v. General Dollar Corp.*, No. 8:04-CV-2366-T-17TBM, 2006 WL 1980277, at *3 (M.D. Fla. Jul. 12, 2006) (same) *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 791 (Fla. 2d DCA 2005) (finding that, under the FWA, a "law, rule, or regulation" must "flow from either a legislatively enacted statute, ordinance, or administrative rule").

We find that, as factual inferences must be resolved in Mr. Seifert's favor, and that the FWA is "construed liberally in favor of granting access to the remedy," *Golf Channel*, 752 So. 2d at 562, there is a genuine factual dispute as to whether Mr. Seifert refused to send the Retainer Wire because it violated federal law—not just internal policy. Nextplat contends that, as far as it was informed, Mr. Seifert's refusal to send the Retainer Wire was based only on violation of internal policy. But Mr. Seifert contends in his declaration that, in fact, he was objecting to the conflict of interest because of his knowledge of SEC regulations. [D.E. 153-1 at ¶44]. To that end, and especially because he was CFO, it is entirely reasonable that Mr. Seifert's objection to a conflict-of-interest-laden transaction was predicated on the fact that

17

SEC enforcement would loom. Accordingly, a reasonable jury could conclude that Mr. Seifert refused to send the Retainer Wire because it violated federal law. *See Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. 4th DCA 2013) (finding that, to demonstrate a protected activity, "[i]t was not necessary that [the employee] provide his employer with statutory and case law citations [at the time of objecting to the activity] to support his claim of illegal conduct").

Next, we must assess whether Mr. Seifert had a "good faith, objectively reasonable belief" that sending the Retainer Wire would violate federal law. *Id*. There is a split among Florida courts as to whether the proper standard is good faith belief, or whether the objected-to conduct must have been an actual violation of the law. In *Aery v. Wallace Lincoln-Mercury, LLC*, the Fourth District Court of Appeal applied the "good faith" standard. *Id*. Meanwhile, the Second District Court of Appeal in *Kearns* instead applied the "actual violation" standard. *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 465 (Fla. 2d DCA 2015). We follow other courts in our District, who have aptly analyzed *Kearns* as dicta and, therefore, have opted to follow the holding in *Aery* that the "good faith" standard applies. *See Swartz v. Interventional Rehab. of S. Fla., Inc.*, No. 21-14137-CIV, 2022 WL 1664128, at *8 (S.D. Fla. Mar. 30, 2022) (applying *Aery* because *Kearns* analysis was dicta); *McManus v. Amerijet Int'l, Inc.*, No. 0:21-CV-61617, 2023 WL 7277252, at *5 (S.D. Fla. Sept. 25, 2023) (same); *Ritenour v. AmeriGas Propane, Inc.*, No. 18-CV-80574, 2019 WL 2008675, at *7 (S.D. Fla. Mar. 15, 2019) (same); *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1340 n.6 (S.D. Fla. 2017) (same).

Here, Mr. Seifert asserts 15 U.S.C. § 78m(b)(2) as the basis for his good faith belief that the Retainer Wire would have violated federal law. A review of § 78m(b)(2)(iii) and (5) reveals at least a genuine dispute as to whether Mr. Seifert's belief was objectively reasonable. The statute requires that publicly-traded companies have in place "internal accounting controls sufficient to provide reasonable assurances that . . . transactions are executed in accordance with management's general or specific authorization." § 78m(b)(2)(iii). Consequently, it is a violation of federal law to fail to implement those accounting controls or to knowingly "circumvent" those accounting controls. *See Sec. & Exch. Comm'n v. Bardman*, 216 F. Supp. 3d 1041, 1055 (N.D. Cal. 2016) (Section 78m(b) "prohibits a knowing failure to implement internal controls [and] a knowing circumvention of controls . . . .").

Mr. Seifert's argument is that because he never received management's authorization, but merely a directive from the conflicted Mr. Fernandez, he would have knowingly circumvented internal controls if he sent the Retainer Wire (which would require an airing and clearing of conflicted transactions). In turn, Mr. Seifert argues that he would have violated federal law. *See* § 78m(b)(5) ("No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls . . . .").

On balance, a reasonable jury could conclude that Mr. Seifert had a good faith belief that a transaction that was authorized only by a conflicted member of management was not properly in accordance with management's authorization. Consequently, because it is objectively reasonable to conclude that to conduct such a

transaction requires circumventing internal controls and thus violates federal law (i.e., § 78m(b)(2)(iii) and (5)), a reasonable jury could then find that Mr. Seifert engaged in protected activity. *See Steenback*, 2013 WL 12085475, at *4 (rejecting employer's argument at summary judgment that the employee did not engage in protected activity under the FWA because the employee's argument, "if true, would constitute an actual violation of [Department of Transportation] regulations."); *Kearns*, 157 So. 3d at 465 (reversing a directed verdict in favor of the employer because the employee "presented evidence that, when viewed in the light most favorable to him, establishes an actual violation of the law"); *Ritenour*, 2019 WL 2008675 at *7 (rejecting the employer's summary judgment argument that plaintiff did not engage in protected activity where the plaintiff testified that the employer was "blatantly ripping off customers" which the plaintiff thought to be "freaking illegal"); *Aery*, 118 So. 3d at 916 (reversing summary judgment in favor of employer where the plaintiff observed the employer commit acts "which, if true, appear[ed] to be illegal, and which [the employee] could have reasonably believed were illegal.").

## 2.   *Causal Connection*

Alternatively, Nextplat argues that Mr. Seifert fails to establish a causal connection between his refusal to send the Retainer Wire and his termination. Under the FWA, a causal connection is demonstrated where "the protected activity and the adverse action are not completely unrelated." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)) (internal citation omitted)); *see also Rice-*

*Lamar*, 853 So. 2d at 1133 (quoting *Olmsted v. Taco-Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)) (finding that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated"). Circumstantial evidence—including temporal proximity—may be employed to demonstrate the casual connection. *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (finding that circumstantial evidence is permitted to establish causation); *see also Entrekin v. City of Panama City, Fla.*, 376 Fed. Appx. 987, 996 (11th Cir. 2010) (finding that temporal proximity may suffice to show causation).

Here, Mr. Seifert puts forth a viable showing of causal connection between his termination and the Retainer Wire. The same day that Mr. Seifert refused to send the Retainer Wire, Mr. Seifert argues that he was threatened with termination and forced to provide a written apology to save his job. Additionally, and also on the same day, Nextplat made a phone call (followed by several more phone calls and emails) to Ms. Carlise—its former CFO—to discuss bringing her back to Nextplat. Less than a week after his refusal to send the Retainer Wire, Mr. Seifert was presented with a release and severance agreement that indicated Nextplat's intent to terminate him. Then, less than two weeks after his refusal to send the Retainer Wire, Mr. Seifert was served with a Notice of Suspension and was terminated.

Quite evidently, Mr. Seifert's refusal to send the Retainer Wire and Nextplat's termination of Mr. Seifert "are not completely unrelated." *Rice-Lamar*, 853 So. 2d at 1133. Even based on temporal proximity alone, the ten-day time period between the

Retainer Wire and the termination certainly help raise a genuine dispute as to causation. *See Bass v. Board of Cnty. Com'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1101–02 (11th Cir. 2001) (finding that temporal proximity supported a finding of causation where adverse employment actions began approximately two months after the employee engaged in a protected activity); *see also Entrekin v. City of Panama City Fla.*, 376 F. App'x. 987, 997 (11th Cir. 2010) (noting that a period of sixteen days between the protected action and the adverse employment action constitutes "'very close' proximity" and thus satisfied the causal connection prong).[3]   That temporal proximity, combined with the June 12 threat to terminate Mr. Seifert and the active seeking of Mr. Seifert's replacement, illustrate that "the circumstances of this case, taken in the light most favorable to [Mr. Seifert], raise a question as to causation." *Steenback*, 2013 WL 12085475, at *7.

### 3.     Legitimate Reason for the Adverse Action and Pretext

At this point, Mr. Seifert has made a *prima facie* showing that he engaged in a protected activity, and there was a causal connection between his engagement in that protected activity and his termination. Now, the burden shifts to Nextplat "to proffer a legitimate reason for the adverse action." *Sierminski*, 216 F.3d at 950.

Nextplat asserts that its legitimate, non-discriminatory reason for its termination of Mr. Seifert was his handling of the Phishing Wire and his response to the Notice of Suspension. Specifically, Nextplat argues that Mr. Seifert failed to take

---

[3] While *Bass* was decided in the context of Title VII retaliation, both Florida courts and the Eleventh Circuit have adopted that framework to analyze FWA causation. *See, e.g., Rice-Lamar*, 853 So. 2d at 1132-33; *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

proper precautions before, during, and after sending the Phishing Wire, and then responded in an inflammatory manner to the Notice of Suspension (which dictated that it was based on the Phishing Wire). As a result, Nextplat asserts that it terminated Mr. Seifert *not* for anything relating to the Retainer Wire, but solely based on his handling of the Phishing Wire (and response to the Notice of Suspension).

Under the *McDonnell-Douglas* framework's particularly light burden at this stage, Nextplat has carried its burden of showing that it had a legitimate, non-discriminatory reason for terminating Mr. Seifert. *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769–70 (11th Cir. 2005) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (finding an employer satisfied its burden by articulating a non-discriminatory reason "[a]s this burden involves no credibility termination, [and] it has been characterized as 'exceedingly light.'").

Next in the analysis comes Mr. Seifert's opportunity to show that Nextplat's legitimate reason for his termination is in fact pretext. To establish pretext, Mr. Seifert must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). Essentially, Mr. Seifert must "point[ ] to evidence that create[s] a genuine issue that the reasons that [Nextplat] gave were false or that a discriminatory reason was more likely the cause of his

termination." *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citing *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Here, Mr. Seifert has presented evidence sufficient for a reasonable jury to conclude that his refusal to send the Retainer Wire—not the Phishing Wire—was the true reason for his termination. Essentially, Mr. Seifert argues that after he refused to send the Retainer Wire on June 12 his termination was already afoot. On that day, Nextplat allegedly threatened his termination, forced a written apology, and began seeking his replacement. The Phishing Wire, Mr. Seifert contends, served merely as an ad-hoc, pretextual excuse to "legally" terminate Mr. Seifert for his refusal to send the Retainer Wire. This, of course, pairs with the temporal proximity of Mr. Seifert's refusal to send the Retainer Wire (June 12), Mr. Seifert being presented with a release and severance agreement for his termination (June 18), Mr. Seifert being suspended (June 21), and Mr. Seifert being terminated (June 22).

Surely, there are instances where "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 Fed. Appx. 502, 506 (11th Cir. 2011). And here, Nextplat asserts that the Phishing Wire and the response to the Notice of Suspension broke any causal link between the Retainer Wire and Mr. Seifert's termination. But the record, viewed in the light most favorable to Mr. Seifert, indicates otherwise. He refused to send the Retainer Wire on June 12. That very same day, Nextplat apparently threatened to terminate Mr. Seifert and the active search for his

replacements as CFO commenced. Nextplat did not learn that the Phishing Wire was errant until June 16 (four days later), and did not suspend Mr. Seifert until June 21. Accordingly, because a reasonable jury could conclude that on June 12 Mr. Seifert's termination was imminent, the Phishing Wire and the response to the Notice of Suspension do not, at this stage, break a potential causal link between Mr. Seifert's protected activity and Mr. Seifert's termination.

To be clear, we by no means find that Mr. Seifert was terminated for a pretextual reason, nor that he was terminated for a legitimate reason. Rather, in light of the summary judgment standard, with all factual inferences being resolved in favor of Mr. Seifert, we find that a reasonable jury could find Nextplat's reasons for terminating Mr. Seifert to be pretextual. Accordingly, summary judgment should be denied as to Mr. Seifert's FWA claim.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Nextplat's motion for summary judgment be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the Court finds good cause to expedite objections. Accordingly, the parties have seven (7) days from service of this Report and Recommendation within which to file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.

28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634

(11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208

(11th Cir. Dec. 16, 2016).

 **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 21st day of

February, 2024.


       /s/ *Edwin G. Torres*_____
       EDWIN G. TORRES
       Chief United States Magistrate Judge